## COMMONWEALTH *vs.* KEVIN KEO.

Essex. September 10, 2013. - January 21, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Constitutional Law,* Assistance of counsel, Sentence, Cruel and unusual punishment, Parole. *Due Process of Law,* Assistance of counsel, Sentence, Parole. *Evidence,* Joint venturer, State of mind. *Joint Enterprise. Accessory and Principal. Parole. Practice, Criminal,* Capital case, Assistance of counsel, Argument by prosecutor, Sentence, Parole.

At a murder trial, in which the Commonwealth proceeded against the defendant on a theory of deliberate premeditation based on his knowing participation in the crime, alone or with others, with the requisite intent for murder, even assuming that the judge abused his discretion in admitting, as evidence of state of mind, testimony regarding certain words written on a friend's bedroom wall, the defendant failed to establish that the admission of such evidence caused prejudice, where the defense was that the friend, not the defendant, alone was the shooter and harbored the intent to kill. [31-33]

At a murder trial, the defendant's counsel was not ineffective for failing to obtain a transcript of a portion of a witness's testimony from the trial of a third party, where this so-called "impeachment" testimony was not likely to have influenced the jury's conclusion, in that the testimony from the other trial would not have established any significant discrepancy from her testimony at the trial at issue. [33-35]

This court declined to exercise its authority pursuant to G. L. c. 278, § 33E, to reduce a verdict of murder in the first degree or to order a new trial, where the conflicting closing arguments advanced by the prosecutor at the defendant's trial and at the earlier trial of a friend of the defendant (i.e., the argument at the defendant's trial that the defendant was the shooter, and the argument at the friend's trial that the friend was the shooter) did not violate principles of due process, in that the core facts in evidence at each trial did not change and were sufficient to support a finding that each defendant had been the shooter, or, as to the friend, that he had been a joint venturer, and, as to the defendant, that he had knowingly participated in the commission of the crime charged with others while he had or shared the intent required for the crime; and in that the prosecutor's change of position in the defendant's case concerning who was the shooter may have resulted from the jury's verdict in the friend's trial; further, the defendant's trial counsel was not ineffective in failing to seek admission of a transcript of the prosecutor's closing argument to the jury in the earlier trial, where that argument would not have been admissible at the defendant's trial as an admission by a party-opponent. GANTS, J., dissenting, with whom BOTSFORD and LENK, JJ., joined. [35-46]

This court vacated a sentence of life without the possibility of parole that had been imposed on a criminal defendant who was under the age of eighteen at the time he committed murder in the first degree, and remanded the case to the Superior Court for further proceedings consistent with *Diatchenko* v. *District Attorney for the Suffolk Dist.*, 466 Mass. 655 (2013), and *Commonwealth* v. *Brown*, 466 Mass. 676 (2013). [46-47]

INDICTMENT found and returned in the Superior Court Department on December 28, 2007.

The case was tried before *David A. Lowy*, J., and a motion for a new trial, filed on December 28, 2011, was heard by him.

*Leslie W. O'Brien* for the defendant.

*Catherine Langevin Semel*, Assistant District Attorney, for the Commonwealth.

*Timothy J. Cruz*, District Attorney, *& Robert C. Thompson*, Assistant District Attorney, for the District Attorney for the Plymouth District, amicus curiae, submitted a brief.

IRELAND, C.J. On November 1, 2007, the victim in this case was shot and killed outside a restaurant in Lynn after being involved in an altercation with four young men, one of whom was Kevin Keo (defendant).[1] The defendant was indicted on a charge of murder in the first degree, and at a jury trial, the Commonwealth proceeded against him on a theory of deliberate premeditation based on his knowing participation in the crime, alone (as the shooter), or with others, with the requisite intent for murder.[2] See *Commonwealth* v. *Zanetti*, 454 Mass. 449, 466-468 (2009). The jury convicted the defendant of murder in the first degree. While his appeal was pending in this court, he filed a motion for a new trial that we remanded to the Superior Court. That motion, as subsequently amended, was denied, as was the defendant's request for an evidentiary hearing. The defendant's appeal from the denial of his motion for a new trial has been

[1] At the time of this crime, the defendant was sixteen years of age. His age was not made known to the jury.

[2] The defendant's friend, Bonrad Sok (Sok), was tried separately for the victim's murder. His trial occurred before the defendant's and he was convicted of murder in the second degree as a joint venturer (Sok's trial predated our decision in *Commonwealth* v. *Zanetti*, 454 Mass. 449 [2009], which effectively erased the distinction between principal and joint liability). Sok's appeal has not been decided. The same prosecutor tried both Sok and the defendant.

consolidated with his direct appeal. Represented by new counsel on appeal, the defendant asserts error in the denial of his new trial motion on the grounds that: (1) his trial counsel rendered constitutionally deficient assistance by failing to obtain a full transcript of a witness's testimony from another trial (involving Bonrad Sok [Sok], see note 2, *supra*) for impeachment purposes, and (2) the trial judge erroneously admitted state of mind evidence. The defendant also argues, citing the United States Supreme Court's decision *Miller* v. *Alabama*, 132 S. Ct. 2455 (2012), that his mandatory sentence to life in prison without the possibility of parole is unconstitutional as applied to him as a juvenile under the Eighth Amendment to the United States Constitution, and that art. 26 of the Massachusetts Declaration of Rights prohibits imposition of a sentence of life without the possibility of parole on juveniles convicted of murder in the first degree. Last, the defendant seeks relief pursuant to G. L. c. 278, § 33E. We affirm the defendant's conviction and the denial of his motion for a new trial. We vacate the defendant's sentence and remand for sentencing consistent with *Diatchenko* v. *District Attorney for the Suffolk Dist.*, 466 Mass. 655 (2013), and *Commonwealth* v. *Brown*, 466 Mass. 676 (2013).

Based on the Commonwealth's evidence, the jury could have found the following facts. The defendant and Bonrad Sok, on the one hand, and the victim, on the other, were members of rival gangs.[3] The Commonwealth introduced evidence that the murder was committed in retaliation for a stabbing of the defendant by the victim approximately five weeks before the victim's murder. At the time of the stabbing, Sok and Vannarith Chhay (Chhay) had been with the defendant. Evidence also was presented that, two months prior to the shooting, the defendant's then girl friend overheard him telling someone that he had a gun, but that it was not in his possession.

In the late afternoon on November 1, 2007, the victim and his girl friend went to a restaurant in Lynn and sat at a booth inside. Nearby, Sok shared a table with Maverick Tran (Tran), Rebecca Pen, and her brother Moses.[4] Sok borrowed Rebecca's

---

[3]The defendant and Sok were part of the gang "IGB" or "insane gangsta bloods." The victim was a "crip," which was part of the "Asian streetwalkers."

[4]Where witnesses share a common surname, we refer to a witness's first name.

cellular telephone, ostensibly to contact his girl friend.[5] Ten to fifteen minutes later, the defendant[6] and Chhay arrived at the restaurant and joined Sok's group.

The victim and his girl friend got up and left the restaurant, followed by Sok, Tran, and Chhay. Outside, Sok asked the victim whether he was a "cuz," meaning "crip."[7] The victim asked him why, and Sok repeated the question. When the victim answered affirmatively, the three men tried to "jump" and hit him. They chased the victim around his automobile, which was parked directly in front of the restaurant, as the victim's girl friend told them to stop.

The victim ran back inside the restaurant, followed by the three men. According to Rebecca, the defendant was at the front door when the men returned. There was a "fight" and the defendant fell on the floor. When the victim's girl friend reentered the restaurant, she saw Sok hitting the victim as he was held in a "bear hug" from behind by Chhay. The restaurant owner's son broke up the fight and told the group to leave. The victim and his girl friend left, followed by the defendant, Sok, Chhay, and Tran. The victim's girl friend did not recall seeing the defendant at the restaurant, inside or outside, but his presence there was established by Rebecca, the owner, and the owner's son, all of whom previously knew him.

The victim's girl friend was the only witness who testified to what next transpired. After leaving the restaurant, she and the victim walked over and stayed at the victim's automobile. Sok, Chhay, and Tran walked past them, and some distance away, to the left of the restaurant sign.[8] The men faced the victim and his girl friend, and Sok and the victim exchanged words. The

---

[5]The defendant later told a friend, Kevin Sim, that he went to the restaurant because Sok had contacted him and told him that the person who had stabbed him was there.

[6]The defendant had an injury to his hand.

[7]Sok's questions to the victim were admitted with a contemporaneous limiting instruction as statements of a joint venturer. The judge repeated the instruction in his final charge, explicitly referencing the statements in the parking lot.

[8]During the direct examination of the victim's girl friend, the prosecutor walked away from her, attempting to approximate the distance between Sok and the victim before the shooting. The judge declined to take judicial notice of the prosecutor's estimation of this distance as about thirty feet because the witness could not herself provide an estimation. Without objection, in his

victim's girl friend heard a "ring" in her ear and looked at herself to see whether she had been shot. The victim said, "Babe, I got shot," then dropped to the ground. Tran's "jaw dropped," and he looked "shocked." Sok and Chhay were gone. The victim's girl friend ran inside the restaurant and asked someone to telephone 911. The owner's son, who had heard a "pop" when the group had been outside, did so. He then ran outside and saw "several" people running down the street.

Police officers responded to the call from the restaurant at approximately 5 P.M. They recovered a .22 caliber discharged cartridge casing near the victim. The victim, who was found on the ground partly leaning against the front entrance to the restaurant, was transported to a hospital where he died. He died as a result of a gunshot wound to the torso, with perforations of the stomach, small intestine, and iliac artery. The bullet had entered the left side of his abdominal area and traveled "left to right, downward, and front to back." The bullet lodged inside the victim's body; there was no exit wound.[9]

Just before 5 P.M., two men, working near the restaurant, saw four young men run past. Shortly thereafter, the defendant, Sok, Chhay, and Tran went to the home of a friend of the defendant, Malcolm Leng King (King), and woke him. They stayed in his room for approximately one hour. King heard the defendant say that something had happened at the restaurant and heard the defendant state, "We shot him." Tran and Chhay left together; Sok and the defendant departed together.

On the Tuesday following the murder, the defendant saw Kevin Sim (Sim) at Rebecca's residence, where Sim also lived. Sim had heard about an incident at the restaurant and asked the defendant about it. The defendant told Sim that he had gone to the restaurant in response to a telephone call from Sok. The defendant stated that Sok, Tran, and Chhay were the ones

closing argument, the prosecutor reminded jurors of the distance, "thirty some-odd feet." The prosecutor should not have stated as such, but where the jury observed the distance at the time of the victim's girl friend's testimony and properly were instructed that counsel's statements during closing argument are not the equivalent of evidence, no substantial likelihood of a miscarriage of justice arose.

[9]There was no testimony from the medical examiner concerning any recovery of the projectile, or fragments therefrom, that was inside the victim's body.

involved in the initial altercation with the victim; the defendant remained inside. The defendant went on to tell Sim that once the victim had reentered the restaurant, the victim had assaulted the defendant and a fight had ensued. The owner told them to leave, but they continued to argue outside and the victim was shot.[10] The defendant told Sim that he had had no intention of harming the victim when he went to the restaurant.

Subsequent to the shooting, in a search of the defendant's home, police recovered one box of .22 caliber ammunition under the defendant's bed and two .22 caliber projectiles in his closet. One of the projectiles, as well as the boxed ammunition, bore the stamp "REM," signifying its manufacturer, Remington. The other loose projectile bore a different marking, possibly a "T" or an "F," indicating a different manufacturer. It appears that the .22 caliber discharged cartridge casing recovered near the victim at the restaurant was from a manufacturer different from that of the ammunition seized from the defendant's bedroom. Lieutenant Michael Vail of the Lynn police department, however, testified that a firearm capable of firing .22 caliber ammunition would be able to fire any brand of .22 caliber ammunition.

On the day following the shooting, police executed a search warrant at Sok's home. They did not find any firearms or ammunition,[11] but photographed three groupings of numbers on Sok's bedroom wall. Lieutenant Vail testified that, based on his training and experience, the numbers are used by local gangs to signify words. He gave his opinion that the numbers on Sok's wall stood for the words "blood family," "insane gangster bloods," and "crip killer."[12]

Testing of the victim's clothing revealed a pattern of nitrate particles. A chemist from the State police crime laboratory gave her opinion that this pattern indicated that the distance from which the victim had been shot could not have exceeded four feet.

---

[10]The defendant did not tell Sim who had shot the victim.

[11]The murder weapon was never recovered.

[12]This evidence was admitted with a limiting instruction, permitting its consideration only in connection with Sok's state of mind and whether the defendant shared that state of mind.

The defendant was arrested several days after the shooting, on November 9, at Rebecca's residence. There, police found him hiding behind a bedroom door.

The defendant did not testify. His counsel argued that Sok had been the shooter and that the defendant's presence and membership in the same gang as Sok did not make him criminally responsible for the crime. The defendant produced one witness, Kathleena Am (Am), and introduced the grand jury testimony of Terry Leng (Terry). On November 1, Am was visiting Terry[13] and when she arrived, Terry's family was present as well as the defendant, Sok, Tran, and Chhay. Am gave Tran and Chhay a ride to another location and then returned to Terry's home. Am, along with Terry, Terry's sister Saky, and another woman, Soy Anna Kouch (Kouch), then headed to an event in Chelsea. Am drove; the four women were inside the automobile, along with Sok and the defendant. During the ride, Am heard Sok say, "I shot him. I think I shot him in the heart," "it would be twenty-five to life," and "I think I shot a crab [meaning a crip]."[14]

In her testimony to a grand jury, Terry relayed that she was in King's room on the night of the shooting and heard either the defendant or Sok say that he had shot somebody. Subsequently, while in Am's automobile, she heard Sok state, "I shot somebody," and "Put the blame on me." Terry recalled that, at the time, Sok was speaking to Kouch.

In rebuttal to Terry's testimony, the Commonwealth called Kouch as a witness who testified that, during the automobile ride, Sok remarked to her, "Whatever happens, put the blame on me. I didn't do anything wrong."

1. *Admission of state of mind evidence.* In his motion for a new trial and on appeal, the defendant argues error in the admission of Lieutenant Vail's testimony that certain numbers on Sok's bedroom wall stood for the words "crip killer." The judge admitted this testimony over the objection of the defendant's trial counsel as probative of Sok's state of mind and

---

[13]Terry resided in the same house as King.

[14]During cross-examination, Kathleena Am was impeached with a statement she made to police shortly after the shooting, in which she initially told them that she could not distinguish between Sok's voice and the defendant's.

whether the defendant, pursuant to *Commonwealth* v. *Zanetti*, shared that state of mind. See *Commonwealth* v. *Zanetti*, 454 Mass. 449, 470 (Appendix) (2009) (individual may be liable as aider and abettor if he "knowingly participated in the commission of the crime charged" alone or with others while he "had or shared the intent required for that crime"). Any error in the admission of this evidence would not have prejudiced the defendant.

"Evidence is relevant if it has a 'rational tendency to prove an issue in the case,' . . . or render a 'desired inference more probable than it would be without [the evidence].' " *Commonwealth* v. *Sicari*, 434 Mass. 732, 750 (2001), cert. denied, 534 U.S. 1142 (2002), quoting *Commonwealth* v. *LaCorte*, 373 Mass. 700, 702 (1977), and *Commonwealth* v. *Fayerweather*, 406 Mass. 78, 83 (1989). "Whether evidence is relevant in any particular instance, and whether the probative value of relevant evidence is outweighed by its prejudicial effect, are questions within the sound discretion of the judge . . . . [T]he judge's determination of these questions will be upheld on appeal absent palpable error." *Commonwealth* v. *Smiley*, 431 Mass. 477, 484 (2000), quoting *Commonwealth* v. *Valentin*, 420 Mass. 263, 270 (1995). See *Commonwealth* v. *Rosario*, 460 Mass. 181, 193 (2011) (defendant bears burden of establishing abuse of discretion and prejudice).

During a sidebar conference, the judge explained his ruling to counsel:

> "[I]t seems to me that the probative value of the evidence is that the Commonwealth has a theory that Sok may have been the shooter and that the defendant shared the same mental state with Sok. In order to understand Sok's mental state, you have to understand the mental state he brought to the restaurant that night. There's no evidence that before he left to go to the restaurant he took an eraser or whited out the numbers [on his bedroom wall]. So, there's an inference that on that occasion, that's the mental state he took to [the restaurant[15]]. And then you have in all the circumstances of this case to suggest that the defendant

[15]The numbers were found the day after the shooting of the victim. A jury reasonably could have inferred that the numbers had been present the day before, namely, on the day of the shooting.

was sharing in that mental state that Sok brought to [the restaurant]."

Here, the words "crip killer" bore on Sok's state of mind. See *Commonwealth* v. *Fernandes*, 427 Mass. 90, 95 (1998) ("A declarant's threat to 'get' or kill someone is admissible to show that the declarant had a particular state of mind and that he carried out his intent"). The words also were significant in establishing the fact that the gang to which the victim belonged was, in fact, a rival to the gang to which Sok and the defendant belonged. In this context, the words bore as well on whether there existed a possible motive for the killing, namely, revenge for the stabbing of the defendant five weeks prior thereto. See *Commonwealth* v. *Stewart*, 454 Mass. 527, 536-537 (2009).

There was no evidence, however, that the defendant saw the words on Sok's wall and affirmed that he too wished to be a "crip killer." Thus, attributing the import of these words to the defendant, without more, is problematic. We need not decide whether the judge abused his discretion in admitting the evidence because its admission could not have prejudiced the defendant, whose defense was that Sok, not him, alone was the shooter and alone harbored the intent to kill. The words served to underscore that it was Sok who had the requisite state of mind to commit murder. The judge's limiting instruction, while not the most artfully constructed, did not require the jury to find that the defendant did in fact share the same state of mind as Sok and did not permit the jury to consider the evidence for its truth.[16] In the circumstances, no prejudice to the defendant has been established.

2. *Ineffective assistance of trial counsel.* At the defendant's trial, the victim's girl friend was the only witness to testify about the distance between Sok and the victim just prior to the shooting. This testimony was important because forensic evidence suggested that the fatal shot was fired from no more than four feet away. In his motion for a new trial, and on appeal, the defendant argues that his trial counsel was ineffective for failing to obtain a

---

[16]Because the statements were not admitted for their truth, there is no merit to the defendant's claim that admission of the "crip killer" reference violated his confrontation rights. See *Crawford* v. *Washington*, 541 U.S. 36, 59 n.9 (2004) (confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted").

transcript of a portion of the victim's girl friend's testimony from Sok's trial. The critical testimony from Sok's trial, he claims, was the victim's girl friend's estimation that Sok was more than twelve feet, but possibly less than twenty feet, from the victim when the shot was fired. This testimony, the defendant asserts, should have been used to impeach the victim's girl friend at his trial and would have prohibited the prosecutor from being able to assert that Sok could not have been the shooter.

We review the defendant's ineffective assistance of trial counsel claim under G. L. c. 278, § 33E, which "is more favorable to a defendant than is the general constitutional standard for determining ineffective assistance of counsel." *Commonwealth v. Frank*, 433 Mass. 185, 187 (2001). See *Commonwealth v. Parker*, 420 Mass. 242, 246 (1995). We consider "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth v. Wright*, 411 Mass. 678, 682 (1992).

We agree with the trial judge who denied the motion that the absence of this so-called "impeachment" testimony at the defendant's trial was not "likely to have influenced the jury's conclusion." *Commonwealth v. Frank, supra* at 188, quoting *Commonwealth v. Wright, supra.* Significantly, the jury were not required to find that the defendant was the shooter because the Commonwealth had proceeded pursuant to *Commonwealth v. Zanetti*, arguing alternatively that the defendant knowingly participated in the crime alone as the shooter, or with others, sharing the intent for murder. Further, any impeachment value from the victim's girl friend's testimony at Sok's trial[17] was diminished by the fact that, at the defendant's trial, the victim's girl friend only was able to say that Sok, Tran, and Chhay were over by the restaurant sign. While the prosecutor suggested a

---

[17]Defense counsel for Sok initially had asked the victim's girl friend to estimate visually the distance in the court room, and she did so, eventually identifying a distance from her measured from "where the security person is." When pressed further, she was able to quantify the distance between those two points only as "more than twelve feet," and was uncertain whether the distance was more or less than twenty feet. The defendant's trial counsel was present during this exchange because he had accompanied the defendant there to be identified in court by the victim's girl friend.

distance of thirty feet, the judge refused to take judicial notice of that distance because the witness was asked and was not able to quantify the actual distance. In the postconviction proceedings, the prosecutor stated (and it was not contested) that, at this time, he had positioned himself at essentially the same position in the court room where Sok's counsel had positioned himself during Sok's trial (in alignment with "the security person," see note 17, *supra*). Thus, the victim's girl friend's testimony from Sok's trial concerning distance would not have established any significant discrepancy from her testimony at the defendant's trial and could not have been used either to impeach her at the defendant's trial or to foreclose the prosecutor from arguing that Sok could not have been the shooter. There was no ineffective assistance of trial counsel on the record before us. See *Commonwealth* v. *Knight*, 437 Mass. 487, 502 (2002), quoting *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001) ("absent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion").

3. *Review pursuant to G. L. c. 278, § 33E.* Although we conclude that there are no issues that would cause us to exercise our authority after review under G. L. c. 278, § 33E, one issue worthy of discussion is the conflicting closing arguments advanced by the prosecutor in the defendant's case and Sok's case. Prosecutors have a special role in the criminal justice system "in the search for truth in criminal trials." *Strickler* v. *Greene*, 527 U.S. 263, 281 (1999). "A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court." *Imbler* v. *Pachtman*, 424 U.S. 409, 424 (1976). Expectations of prosecutors are demanding:

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim

of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

*Berger* v. *United States*, 295 U.S. 78, 88 (1935). See *Commonwealth* v. *Weaver*, 400 Mass. 612, 615-616 (1987) (role of prosecutor "is to assist the jury to discover the truth").

In view of a prosecutor's unique role in criminal proceedings, some courts have found, mainly in cases involving the death penalty, that the use of inherently factually contradictory theories against different defendants for the same crime violates the principles of due process, *United States* v. *Higgs*, 353 F.3d 281, 326 (4th Cir. 2003). See *State* v. *Poe*, 284 Neb. 750, 765 (2012) (recognizing that State and Federal courts, in concluding that inconsistent prosecutorial theories sometimes may violate due process, do so in cases that "almost exclusively involve the death penalty"). For a due process violation to occur, "an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime." *Smith* v. *Groose*, 205 F.3d 1045, 1047, 1051-1052 (8th Cir.), cert. denied, 531 U.S. 985 (2000) (finding due process violation where, in obtaining two convictions for same murder, prosecutor "manipulat[ed]" evidence by using different and conflicting statements from same cooperating codefendant). Such a "core" change may occur where a party "wholly without explanation, . . . make[s] a fundamental change in its version of the facts between trials, and then conceal[s] this change from the final trier of the facts." *United States* v. *GAF Corp.*, 928 F.2d 1253, 1260 (2d Cir. 1991). Thus, the change typically involves the use of evidence at the different trials which was "factually inconsistent and irreconcilable." *United States* v. *Paul*, 217 F.3d 989, 998 (8th Cir. 2000), cert. denied, 534 U.S. 829 (2001). The change also possibly may represent an attempt by a prosecutor to undertake criminal proceedings against a second individual whom the prosecutor otherwise would not have been able to prosecute. See *United States* v. *Dickerson*, 248 F.3d 1036, 1043-1044 (11th Cir. 2001),

cert. denied, 536 U.S. 957 (2002). Due process violations have also resulted when a prosecutor's "pursuit of fundamentally inconsistent theories in separate trials against separate defendants charged with the same murder [involves a situation where a prosecutor] knowingly uses false evidence or acts in bad faith." *Nguyen* v. *Lindsey*, 232 F.3d 1236, 1240 (9th Cir. 2000).

Significantly, in situations where a prosecutor argues at different trials that the defendant then on trial was the shooter for the same crime, courts have rejected due process challenges to the convictions. See, e.g., *Commonwealth* v. *Housen*, 458 Mass. 702, 708-709 (2011); *United States* v. *Frye*, 489 F.3d 201, 214 (5th Cir. 2007), cert. denied, 552 U.S. 1126 (2008); *United States* v. *Paul, supra* at 998-999; *Nguyen* v. *Lindsey, supra* at 1240-1241; *State* v. *Poe*, 284 Neb. at 768. Courts have done so where it cannot be determined which of the two defendants was the shooter and where either defendant could have been convicted as a principal or as an aider and abettor, accomplice, or joint venturer. See *United States* v. *Paul, supra* at 998. See also *Commonwealth* v. *Housen, supra* (no due process violation where evidence was ambiguous as to identity of shooter, and where such a determination "was not essential" to joint venture theory); *Council* v. *Commissioner of Correction*, 114 Conn. App. 99, 111-112 (2009) (no due process violation where, at separate trials, prosecutor argued each defendant could have been shooter and each shooter was charged as both principal and accessory); *Sifrit* v. *State*, 383 Md. 77, 106 (2004), cert. denied, 543 U.S. 1056 (2005) ("a due process violation will only be found when the demonstrated inconsistency exists at the core of the State's case. Discrepancies based on rational inferences from ambiguous evidence will not support a due process violation provided the two theories are supported by consistent underlying facts"). In these circumstances, it is said that any inconsistency is "immaterial" to the conviction. See *United States* v. *Frye, supra.* Cf. *Bradshaw* v. *Stumpf*, 545 U.S. 175, 186-187 (2005) (upholding guilty plea where defendant's "assertions of inconsistency relat[ed] entirely" to which individual shot victim, but where "the precise identity of the triggerman was immaterial to [defendant's] conviction for aggravated murder"; further review of death sentence, however,

was warranted in circumstances). Courts also have found important to the analysis that (1) each theory of liability was supported by the evidence, see *Commonwealth* v. *Housen,* *supra* at 707; *United States* v. *Paul, supra* at 998; (2) the use of evidence at the different trials was not factually inconsistent and irreconcilable at the "core," see *United States* v. *Paul, supra* at 998, but see *Thompson* v. *Calderon,* 120 F.3d 1045, 1057, 1059 (9th Cir. 1997), rev'd on other grounds, 523 U.S. 538 (1998) (finding due process violation on rape conviction where prosecutor argued at different trials that each defendant committed rape and murder and where in second trial, prosecutor "manipulated evidence and witnesses, argued inconsistent motives," and "offer[ed] facts that directly conflicted with the underlying premise of the charges . . . brought");[18] and (3) the prosecutor had acknowledged in closing arguments, that the evidence was conflicting as to who shot the victim, see *United States* v. *Paul, supra.*

Here, no due process violation occurred where the prosecutor argued principally at Sok's trial that Sok had shot the victim, and where the main thrust of the prosecutor's argument at the defendant's trial was that the defendant had shot the victim. Significantly, at Sok's trial, the Commonwealth proceeded pursuant to a joint venture theory, and at the defendant's trial, pursuant to *Commonwealth* v. *Zanetti,* 454 Mass. at 470 (Appendix) (individual may be liable as aider and abettor if he "knowingly participated in the commission of the crime charged" alone or with others while he "had or shared the intent required for that crime"), which had recently been decided. The prosecutor acknowledged at each trial in his closing argument that the jury were not required to decide who was the shooter because, as he stated in Sok's trial, "[T]hey both are guilty," and as he similarly

---

[18]The Supreme Court of Iowa recognizes the "right" of the prosecution "to rely on alternative theories in criminal prosecutions albeit that they may be inconsistent." *State* v. *Watkins,* 659 N.W.2d 526, 532 (Iowa 2003). A "narrow exception" exists that is limited to the "selective use of evidence by the prosecution in order to establish inconsistent factual contentions in separate criminal prosecutions for the same crime [which is] so egregious and lacking in good faith as to constitute a denial of due process." *Id.* The court reasoned, "There is, after all, a safeguard against abuse as a result of the prosecution's burden to prove any theory it asserts by evidence beyond a reasonable doubt." *Id.*

related in the defendant's trial, "They're all guilty. . . . They shot him." The evidence, concerning the motive and circumstances of the killing (no one saw and could identify the shooter), essentially was the same in each trial; the underlying "core" facts in evidence did not change. The evidence in each trial was sufficient to support a finding that each defendant had been the shooter, or alternatively, as to Sok, had been a joint venturer, and as to the defendant, had "knowingly participated in the commission of the crime charged" with others while he "had or shared the intent required for that crime." *Id.* Further, the prosecutor's change of position in the defendant's case concerning who was the shooter may have resulted from the jury's verdict in Sok's trial, specifying that Sok was guilty of murder in the second degree only as a joint venturer.[19] See *Sifrit* v. *State*, 383 Md. at 106 ("evidence presented at multiple trials is going to change to an extent based on relevancy to the particular defendant and other practical matters"). Last, there is no suggestion of prosecutorial misconduct or bad faith.

Our examination, however, does not end here. Some courts, in certain circumstances, have found a prosecutor's argument to a jury admissible in evidence in subsequent litigation as an admission by a party opponent under Federal Rules of Evidence 801 (d) (2) or its State's counterpart.[20,21] See, e.g., *Commonwealth* v. *Tucceri*, 412 Mass. 401, 406 (1992) (prosecutors

---

[19]Before returning the verdict in Sok's trial, the jury asked the judge the following questions: "To reach a joint venture conviction [for Sok], must the primary joint venturer be specifically identified? Does it have to be Mr. Keo?" The judge, due to the content of the Commonwealth's bill of particulars, replied "Yes" to each question.

[20]Federal Rule of Evidence 801 (d) (2) provides, in relevant part, that a statement is not hearsay if "[t]he statement is offered against an opposing party and (A) was made by the party in an individual or representative capacity; (B) is one the party manifested that it adopted or believed to be true; (C) was made by a person whom the party authorized to make a statement on the subject; [or] (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." See Mass. G. Evid. § 801 (d) (2) (2013).

[21]In *Ruszcyk* v. *Secretary of Pub. Safety*, 401 Mass. 418, 423 (1998), we adopted the principles expressed in Proposed Mass. R. Evid. 801 (d) (2) (D), which mirrors Fed. R. Evid. 801 (d) (2) (D), and which provides that a statement is not hearsay and is admissible for its truth where it is "offered against a party" and was made by a party's "agent or servant concerning a matter within the scope of [the party's] agency or employment." The *Ruszcyk* deci-

are agents of State); *United States* v. *Salerno*, 937 F.2d 797, 811-812 (2d Cir. 1991), rev'd on other grounds, 505 U.S. 317 (1992) (opining in dicta that government's opening and closing statements in prior trial should have been admitted as admissions of party-opponent in subsequent trial to show inconsistent positions of government); *United States* v. *Kattar*, 840 F.2d 118, 130 (1st Cir. 1988) (concluding that government, as represented by prosecutor, is considered "party-opponent" of defendant in criminal case); *Hoover* v. *State*, 552 So.2d 834, 838, 840 (Miss. 1989) (prosecutor's inconsistent argument regarding who was shooter should have been admitted at codefendant's later trial).

In *United States* v. *McKeon*, the United States Court of Appeals for the Second Circuit concluded that *opening statements* by a *defendant's attorney* in a criminal case are admissible under Fed. R. Evid. 801 (d) (2) where they are (1) "assertion[s] of fact" that are the "equivalent of a testimonial statement by the [client];" and (2) "inconsistent with similar assertions in a subsequent trial." *United States* v. *McKeon*, 738 F.2d 26, 30, 33 (2d Cir. 1984). The court cautioned, however, that "[s]peculations of counsel, advocacy as to the credibility of witnesses, arguments as to the weaknesses in the prosecution's case or invitations to a jury to draw certain inferences should not be admitted." *Id.* at 33. In addition, the court explained that the "inconsistency" "should be clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial." *Id.* Before admitting the prior jury argument, a court must, outside of the jury's presence, "determine by a preponderance of the evidence that the inference the prosecution seeks to draw from the inconsistency is a fair one and that an innocent explanation for the inconsistency does not exist." *Id.* Before reaching its conclusion, the court

sion rejected the common-law rule governing out-of-court admissions of an agent, "chang[ing] the analysis from an inquiry into a declarant's or servant's authorization to *speak*, to an inquiry into the authorization to *act*" (emphasis added). *Id.* at 420 n.3. Thus, our earlier holding in *Commonwealth* v. *Arsenault*, 361 Mass. 287, 298 (1972), that in the second trial of a defendant, the defendant was not entitled to introduce the prosecutor's closing argument made at his first trial "as an admission by the Commonwealth," is no longer sound precedent.

remarked that "prior opening statements are not per se inadmissible in criminal cases. To hold otherwise would not only invite abuse and sharp practice but would also weaken confidence in the justice system itself by denying the function of trials as truth-seeking proceedings. That function cannot be affirmed if parties are free, wholly without explanation, to make fundamental changes in the version of facts within their personal knowledge between trials and to conceal these changes from the final trier of fact." *Id.* at 31.

Subsequently, in *United States* v. *Salerno*, 937 F.2d at 810-811, the court, in dicta, indicated that statements satisfying the requirements cited in *United States* v. *McKeon, supra,* made by a prosecutor during a *closing argument* at a prior, related trial, would be admissible. See *United States* v. *Orena*, 32 F.3d 704, 716 (2d Cir. 1994). However, when an additional theory for a murder is offered at a later trial of a different defendant for that same murder, "the prosecutor's theories" have been held not to be contradictory. See *id.* Cf. *State* v. *Williams*, 79 Wash. App. 21, 30-31 (1995) ("when an attorney is permitted to state alternative or inconsistent [positions], the statement does not qualify as the admission of a party opponent").

In this case, because we were concerned with the prosecutor's inconsistent closing argument at Sok's trial and at the defendant's trial concerning who shot the victim, we invited further briefing regarding whether the defendant's trial counsel was ineffective at the defendant's trial in failing to seek admission of a transcript of the prosecutor's closing argument in Sok's trial.[22] We find no error.

As an initial matter, we note that the claim of ineffective assistance of trial counsel suggested at oral argument derives from the law of the Second Circuit and not from any precedent in Massachusetts. While numerous Federal and State courts permit admissions against interest by a party-opponent, including admissions by prosecutors, we have never done so or, in the words of the dissent, "adopted the logical corollary," *post* at 51, in the context of admitting a transcript of a prosecutor's closing argu-

---

[22]The defendant frames the issue differently, namely, as a failure of trial counsel to obtain the entire transcript of Sok's trial. The distinction is not material.

ment from another defendant's trial. In these circumstances, we cannot say that the defendant's trial counsel was ineffective at the defendant's trial in failing to seek admission of the transcript based on the law of the Second Circuit. See *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 12, 20 (1986) (concluding that defense counsel was not ineffective for failing to advance argument based on principle unfamiliar in Massachusetts, although espoused in United States Supreme Court ruling invalidating New York statute). Cf. *Commonwealth* v. *Mahar*, 442 Mass. 11, 19 (2004) (attorneys are not required to foresee future); *Commonwealth* v. *Smith*, 427 Mass. 245, 256-257 (1998) (counsel not ineffective for failing to object to charge under *Commonwealth* v. *Tuey*, 8 Cush. 1, 2-3 [1851], some five years before it was criticized). Further, even under the law of the Second Circuit, a transcript of the prosecutor's closing argument from Sok's trial would not have been admissible at the defendant's trial because the Commonwealth properly presented alternative (albeit inconsistent) theories of liability in each trial and in so doing presented different theories that as a matter of law are not contradictory. See *United States* v. *Orena*, 32 F.3d at 716. Cf. *State* v. *Williams*, 79 Wash. App. at 30-31. The dissent ignores this law. There was no error.

Apart from the existence of alternative legal theories at each trial, our conclusion that the prosecutor's closing argument at Sok's trial would not have been admissible at the defendant's trial is reinforced by other factors. At the defendant's trial, the prosecutor's theories of liability came as no surprise, as each theory was supported by the evidence. The "core" evidence presented at both the defendant's trial and Sok's trial, as previously has been mentioned, essentially was the same. Although that evidence was ambiguous as to who was the shooter, the "core" evidence strongly implicated *both* the defendant and Sok as being involved and responsible for the victim's death.[23] Certainly, at the defendant's trial the prosecutor never abandoned

[23]The dissent also ignores this evidence, attempting to extinguish any accomplice or joint venture type of liability because the defendant "could not reasonably have anticipated that the victim would return to the restaurant," see *post* at 48. This statement is complete speculation. Only a "few minutes" transpired from when Sok, Chhay, and Tran left the restaurant to follow the victim and his girl friend to when they all reentered. Just because the defend-

his argument that the jury ultimately were not required to determine the identity of the shooter. Further, there was no manipulation or concealment of evidence, or other prosecutorial misconduct. The jury were instructed correctly that the closing arguments of counsel are not evidence. In these circumstances, we conclude that the prosecutor's closing argument at Sok's trial would not have been admissible at the defendant's trial and that his trial counsel, therefore, was not ineffective in failing to seek its admission.

We add that even under Second Circuit law, the evidence of the prior closing argument could have been used only if there had been a judicial determination "by a preponderance of the evidence . . . that an innocent explanation for the inconsistency d[id] not exist." *United States* v. *McKeon*, 738 F.2d at 33. While we do not have the benefit of an affidavit of the prosecutor which could have been obtained in proceedings that usually follow the filing of a motion for a new trial (the proper vehicle to vet a claim of ineffective assistance of trial counsel), we cannot ignore the probable impact on the prosecutor of the jury's verdict in the Sok trial — that Keo had been the shooter and that Sok was liable as a joint venturer. See

ant did not follow them outside initially does not mean that there was not a plan to taunt and chase the victim back inside the restaurant, or to shoot and kill him at some point after they had their way with the victim. Regardless, thereafter, at the relevant time of the shooting, all four men, including Sok and the defendant, went back outside. On this point raised by the dissent, we add (noting that no substantial likelihood of a miscarriage of justice existed) that at Sok's trial, there was evidence from Chhay that inside the restaurant Sok and the defendant plotted to "do it outside." According to Chhay the defendant said, "Do it outside, not inside; yo, I've got the blammer." Chhay also recounted that the defendant had the gun and only gave the gun to Sok *after* the shooting when they were at "the house," presumably King's residence. The evidence at the defendant's trial did not foreclose the jury from reasonably inferring that a plan to kill the victim had been agreed on by Sok and the defendant before Sok, Chhay, and Tran first went outside following the victim and his girl friend. Just before their departure, Rebecca Pen testified that the defendant and Chhay were seated right next to the table at which she was seated together with Sok. Statements of the defendant put the defendant at the same table at this time "with his friends." That evidence, together with the motive evidence, and testimony from Sim (that the defendant said that Sok contacted him to come to the restaurant because of the victim's presence), permitted the jury reasonably to infer that Sok and the defendant made a plan to kill the victim well before Sok, Tran, and Chhay initially followed the victim outside.

*United States* v. *James,* 712 F.3d 79, 102-103 (2d Cir. 2013) (no error in excluding prosecutor's prior jury argument because "innocent explanation" existed for inconsistency). The dissent dismisses these facts, concluding, essentially, as a matter of law, that a jury's verdict could never result in an "innocent explanation." We disagree.

The dissent also misstates the evidence the prosecution had at Sok's trial that was used to establish that Sok was the shooter. The prosecutor called Am and Terry to testify concerning statements they heard Sok make that he was the shooter (the victim's girl friend could not say who shot the victim). Not uncommon in gang-related trials, each witness, who were youths at the time of the shooting (Am was seventeen years of age and Terry was sixteen years of age), at trial could not recall who exactly had made the incriminating statements. In fact, Leng had no recall of the day, where she was going, giving Sok and the defendant a ride, hearing any statements, or even telling the grand jury anything. Consequently, in the case of Am, the prosecutor tried to elicit Sok's statements through her statements to police, but was unsuccessful because during cross-examination she agreed that the police wore her down and she only told them what they wanted to hear.[24] Regarding Terry, after getting nowhere during his direct examination with her, the prosecutor was able only to elicit Sok's statement (that he shot the victim) through the admission of Terry's grand jury testimony. Witness recantation or memory loss certainly can serve also as an "innocent explanation" for a prosecutor arguing that another coventurer was the shooter was in a subsequent trial. To remand this case for further proceedings on this record, where apparent explanations exist for the prosecutor's shift in argument (concerning the identity of the shooter), undermines judicial economy, ignores what occurred at Sok's trial and its import, and belittles the substantial difficulties and challenges faced by prosecutors in many gang-related cases.

Even if the defendant's trial counsel should have sought admission of the prosecutor's closing argument in Sok's trial,

---

[24]Am's memory was fine at the defendant's trial and she testified for the defense that, after the shooting, when she was driving that night, she heard Sok state, "I think I shot a crab."

any error in its exclusion at the defendant's trial was not likely "to have unfairly influenced the jury's verdict." *Commonwealth* v. *Johnson*, 429 Mass. 745, 754 (1999). This is so because the Commonwealth submitted the case to the jury pursuant to *Commonwealth* v. *Zanetti*, 454 Mass. at 470. As such, the jury could have reached its verdict without determining that the defendant had been the shooter. See *Commonwealth* v. *Semedo*, 456 Mass. 1, 18 (2010) (distinctions concerning who in joint venture was portrayed as principal "less meaningful" after *Zanetti* decision). The dissent's position on this consequence ignores the import of the *Zanetti* decision and the corresponding jury instruction that was given in this case. No substantial likelihood of a miscarriage of justice occurred. Although a transcript of the prosecutor's closing argument at Sok's trial might have strengthened the defendant's case,[25] assuming that it even would have been admissible, the defendant was not deprived of his constitutional right to present a case. His trial counsel vigorously argued that Sok had been the shooter and offered evidence in the nature of statements that Sok had made to Am and Terry that he (Sok) had shot the victim. The evidence in both trials, at the "core," was the same, and was sufficient in this case to support the jury's verdict. The prosecutor remarked in his closing argument at each trial that it was not necessary to determine who the shooter was because each defendant was legally responsible under a joint venture theory (as to Sok) or pursuant to *Commonwealth* v. *Zanetti*, *supra* (as to the defendant). Any error, based on the evidence in these trials and the judge's instructions to the jury, did not pertain to "actual as compared to legal innocence," *Calderon* v. *Thompson*, 523 U.S. 538, 559 (1998), quoting *Sawyer* v. *Whitley*, 505 U.S. 333, 339 (1992), and thus

---

[25]The trial judge would have had discretion to exclude the prior argument if he concluded that "the probative worth of the evidence [was] outweighed by the prejudicial effect it may have [had] on the jury." *Commonwealth* v. *Lewin*, 407 Mass. 629, 631 (1990). The judge could have found that delving into the background of Sok's trial would have complicated matters for the jury. Admission of the prosecutor's closing argument from Sok's trial at the defendant's trial might also have foreclosed the prosecutor's continued role in the defendant's trial. See *United States* v. *McKeon*, 738 F.2d 26, 34-35 (2d Cir. 1984) (disqualification of trial counsel appropriate "where counsel assumes a role as an unsworn witness whose credibility is in issue").

did not result in a substantial likelihood of a miscarriage of justice.[26]

That said, prosecutors, in future cases, should proceed with caution when asserting inconsistent arguments in different trials involving the same crime, assuming no "innocent explanation," significant changes, or new evidence have come to light. We note that, particularly after *Commonwealth* v. *Zanetti, supra,* there is no need for a prosecutor to emphasize principal liability. If a prosecutor does so and the position is inconsistent with what he formerly argued at another trial for the same crime, he does so possibly at his own peril.

4. *Sentence.* In a recent decision issued after the defendant's conviction, the United States Supreme Court concluded that imposition of a "mandatory life [sentence] without parole for those under the age of [eighteen] at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Miller* v. *Alabama,* 132 S. Ct. 2455, 2460 (2012). In view of this decision and the fact that the defendant was sixteen years of age at the time of the offense, see note 1, *supra,* the defendant argues, and the Commonwealth agrees, that the defendant's sentence of life in prison without parole is invalid under the Eighth Amendment pursuant to *Miller.* The defendant also argues that art. 26 of the Massachusetts Declaration of Rights prohibits imposition of both a mandatory and discretionary sentence of life without the possibility of parole on juveniles convicted of murder in the first degree. We recently addressed these contentions in *Diatchenko* v. *District Attorney for the Suffolk Dist.,* 466 Mass. 655, 667-671 (2013). In *Diatchenko,* we held that the *mandatory* imposition of a sentence of life in prison without the possibility of parole on juvenile homicide offenders violates the Eighth Amendment and art. 26.

---

[26]The defendant suggests that the prosecutor's argument at Sok's and the defendant's trials, concerning Am's testimony of what Sok stated to her and regarding the victim's girl friend's testimony about the distance between Sok and the victim at the time of the shooting, also was inconsistent. These arguments, however, involved statements different in kind than the prosecutor's remarks concerning who was the shooter. See *United States* v. *McKeon,* 738 F.2d at 33 ("[s]peculations of counsel, advocacy as to the credibility of witnesses, arguments as to the weaknesses in the prosecution's case or invitations to a jury to draw certain inferences should not be admitted").

*Id.* at 667. We also concluded that *discretionary* sentences of life without parole for juvenile offenders violates art. 26. *Id.* at 669-671. We explained, however, that the lesser punishment under G. L. c. 265, § 2, of mandatory life in prison with the possibility of parole, set pursuant to the parole eligibility statute in effect at the time of the juvenile offender's crime, would apply.[27] *Id.* at 673. See *Commonwealth* v. *Brown*, 466 Mass. 676, 678 (2013). Thus, the defendant's sentence cannot stand.

5. *Conclusion.* We affirm the defendant's conviction and the denial of his motion for a new trial. We vacate the defendant's sentence and remand the case to the Superior Court for sentencing proceedings consistent with our decisions of *Diatchenko* and *Brown*.

*So ordered.*

GANTS, J. (dissenting, with whom Botsford and Lenk, JJ., join). In his closing argument in the trial of Bonrad Sok, the prosecutor began by telling the jury, "The defendant [Sok] shot and killed Christian Martinez on November 1st of 2007." He later argued, "Kevin [Keo] brought the gun and Bonrad [Sok] shot it." He said that when the victim left the restaurant the second time, when the shooting occurred, "that's when Bonrad [Sok] had the gun, as again [*sic*] Kevin [Keo], with [Keo's] dominant hand with the limited mobility, that's what happened." In that argument, the prosecutor addressed the testimony of Kathleena Am, who testified that after the shooting, while sitting in an automobile with Sok and Keo, she heard one of them say, "I shot him; I shot him in the heart." Although Am said she did not know who had made that statement, the prosecutor asserted he could tell the jury "where it came from. It came from him [pointing at Sok]."

However, six months later, in the trial of Keo for the same crime, the same prosecutor, based on what the Commonwealth and the court concede was essentially the same evidence, told a

[27]In *Diatchenko* v. *District Attorney for the Suffolk Dist.*, 466 Mass. 655, 666 (2013), we determined that the decision in *Miller* v. *Alabama*, 132 S. Ct. 2455 (2012), has retroactive application.

different story to the jury in his closing argument. Here, he argued that Keo "is the shooter, that's what all the evidence shows." He said, "It couldn't have been Bonrad [Sok]," because the fatal shot was fired from within four feet of the victim, and Sok was approximately thirty feet from the victim at the moment of the shooting. Addressing the testimony of Am, who at Keo's trial testified that Sok had admitted to being the shooter, the prosecutor said that, even if Sok had said that, the inference that he was "confessing right there . . . just flat-out can't be true based on the evidence."

In each case, the prosecutor also pursued a joint venture theory, and told the jury that they could convict even if they found that Keo (in the Sok trial) or Sok (in the Keo trial) was the shooter. But a joint venture theory was far harder for the prosecution to prove. Based on the evidence, it reasonably could be inferred that Sok telephoned Keo when he saw the victim at the restaurant, and that Keo then arrived at the restaurant with a gun. When the victim left the restaurant, Keo remained in the restaurant, but Sok, Maverick Tran, and Vannarith Chhay followed the victim out, confronted him outside the restaurant, and assaulted him, but did not shoot him. It was only after the victim unexpectedly returned to the restaurant after this confrontation that he got into a fight with Keo, Sok, Tran, and Chhay, and was shot at close range shortly after he again left the restaurant. There can be no doubt that the shooter intended with premeditation to kill the victim. But if Sok was the shooter, there certainly could have been a reasonable doubt whether Keo shared Sok's premeditation and intent to kill, particularly where Sok did not kill the victim when he first had the chance outside the restaurant and where Keo could not reasonably have anticipated that the victim would return to the restaurant.

No doubt recognizing the weakness in the Commonwealth's joint venture theory, Keo's counsel rested his defense on the argument that Sok was the shooter. That defense would have been immeasurably stronger had defense counsel offered in evidence, as admissions of an opposing party, statements made by the prosecutor in his closing argument in the Sok trial, because the prosecutor told the jury in that trial what defense counsel was arguing in the Keo trial. But Keo's defense counsel did not

seek to do so. The court concludes that defense counsel's failure to offer these admissions in evidence is without consequence because: (1) the prosecutor's statements would not have been admissible in evidence if offered; (2) even if these statements were admissible their admission would not likely have influenced the jury's verdict; and (3) the verdict is consonant with justice under G. L. c. 278, § 33E, even though the jury never learned that the same prosecutor in his closing argument in the Sok trial had declared that Sok was the shooter. I disagree with each of these three conclusions, and therefore respectfully dissent.[1]

Before commencing my critique of the court's opinion, let me first be clear as to what I am *not* contending. I do *not* contend that the prosecutor was legally barred from arguing at Keo's trial that Keo was the shooter where he had argued at Sok's trial that Sok was the shooter, or that Keo's right to due process was violated by his doing so. A prosecutor may argue any theory of criminal liability supported by the evidence, and is not bound in a subsequent case to a theory argued in an earlier case. See *Commonwealth* v. *Housen*, 458 Mass. 702, 709 (2011).

What I *do* contend is that, although the Commonwealth may take "the same evidentiary clay" it used in the *Sok* trial and "resculpt" it in a subsequent trial to transform Keo from an aider and abettor to a shooter:

> "[t]he jury [are] at least entitled to know that the government at one time believed, and stated, that its proof established something different from what it currently claims. Confidence in the justice system cannot be affirmed if [the Commonwealth] is free, wholly without explanation, to make a fundamental change in its version of the facts between trials, and then conceal this change from the final trier of the facts."

*United States* v. *Salerno*, 937 F.2d. 797, 812 (2d Cir. 1991), rev'd on other grounds, 505 U.S. 317 (1992), quoting *United States* v. *GAF Corp.*, 928 F.2d 1253, 1260 (2d Cir. 1991).[2]

---

[1] I concur with the court that, given that the defendant's conviction of murder in the first degree is affirmed, the defendant's sentence should be reduced to life with the possibility of parole.

[2] I have inserted in brackets the words "the Commonwealth" in place of the words "any party" that are used in this quotation because I limit my discussion

1. *Admissibility of the prosecutor's inconsistent statements in closing argument in the Sok trial.* In *Commonwealth* v. *Arsenault*, 361 Mass. 287, 298 (1972), this court held "that in the second trial of a defendant, the defendant was not entitled to introduce the prosecutor's closing argument made at his first trial 'as an admission by the Commonwealth.' " See *ante* at note 21. In *Arsenault*, the prosecutor had argued in the first trial, at which Arsenault was tried with his alleged joint venturers, Arthur L. Devlin and Russell P. LeBlanc, "that the defendant LeBlanc was the 'finger man' for the robbery which resulted in the alleged murder, that he had selected the house in which the robbery would be committed and that he had brought the defendant and Devlin there for that purpose." *Id.* at 297. At the second trial, which occurred fifteen years later, and where Arsenault was the only defendant, the prosecutor argued that "Arsenault looked at a house and said, 'That looks like a good place to rob. Let's rob that house.' " *Id.* The *Arsenault* court affirmed the judge's exclusion of the prosecutor's prior assertions in his opening statement and closing argument in the second trial, stating, "Admittedly the two trials proceeded on different theories of the defendant's part in the crimes, but the trial of a case on one theory does not, without more, constitute an admission by a party who proceeds on a different theory in a retrial of the case." *Id.* at 298.

The court correctly states that "our earlier holding in *Commonwealth* v. *Arsenault*, 361 Mass. [at 298], that in the second trial of a defendant, the defendant was not entitled to introduce the prosecutor's closing argument made at his first trial 'as an admission by the Commonwealth,' is no longer sound precedent." *Ante* at note 21. The court then proceeds to create its own unsound precedent, effectively resurrecting the same holding it just buried.

---

to the admission of the prosecutor's statements in closing argument and do not address whether an inconsistent statement by a defense counsel in opening statement or closing argument may also be admissible in evidence as an admission of an opposing party, as it was held to be in *United States* v. *McKeon*, 738 F.2d 26, 34 (2d Cir. 1984). Because a prosecutor plays a "special role . . . in the search for truth in criminal trials," *Strickler* v. *Greene*, 527 U.S. 263, 281 (1999), the admission of a prosecutor's contrary assertion in a previous opening statement or closing argument warrants a legal analysis different from that for the admission of a defense counsel's contrary prior statement.

The court acknowledges that we have stated that prosecutors "are agents of the State." *Commonwealth* v. *Tucceri*, 412 Mass. 401, 406 (1992). See *ante* at 39-40. The court also acknowledges that numerous Federal courts, including the United States Court of Appeals for the First Circuit, have concluded that "the Federal Rules clearly contemplate that the federal government is a party-opponent of the defendant in criminal cases," *United States* v. *Kattar*, 840 F.2d 118, 130 (1st Cir. 1988), quoting *United States* v. *Morgan*, 581 F.2d 933, 937 n.10 (D.C. Cir. 1978), and that the prosecutor acts as the agent of the Federal government in a criminal prosecution. *Kattar, supra* at 131, quoting *United States* v. *Powers*, 467 F.2d 1089, 1097 n.1 (7th Cir. 1972), cert. denied, 410 U.S. 983 (1973) (Stevens, J., dissenting) ("assertions made by the government in a formal prosecution . . . 'establish the position of the United States and not merely the views of its agents who participate therein' "). See *ante* at 40. The United States Court of Appeals for the Second Circuit adopted the logical corollary to this legal principle and, applying Fed. R. Evid. 801 (d) (2), has ruled that a defendant in a criminal case may offer in evidence prior statements made by an assistant United States attorney that are factually inconsistent with the government's theory of the case at trial. See, e.g., *Salerno*, 937 F.2d at 810-812 (judge abused discretion in excluding statements in Federal prosecutor's opening statement and closing argument at earlier trial that characterized defendant as victim of extortion rather than participant in fraudulent bid-rigging, concluding, "The government, at different times, has urged both [that the defendant was a "culpable bid-rigger" and a "puppet on a string"] — and the jury [were] entitled to know that, because the jury, and not the government, must ultimately decide which he was");[3] *GAF Corp.*, 928 F.2d at 1262 (judge erred in excluding inconsistent original bill of

[3]The court states that the conclusion of the United States Court of Appeals for the Second Circuit in *United States* v. *Salerno*, 937 F.2d 797, 811-812 (2d Cir. 1991), rev'd on other grounds, 505 U.S. 317 (1992), that the judge abused her discretion in refusing to admit the prosecutor's inconsistent statements in an earlier closing argument, was "dicta." *Ante* at 40, 41. To the extent this characterization suggests that the court's conclusion was without practical consequence, it is misleading. Although the Court of Appeals reversed the convictions on other grounds, it recognized that a retrial was "likely" and reached the issue to "offer some guidance on this subject." *Salerno, supra* at 811.

particulars prepared by assistant United States attorney who tried case, concluding, "Although the Court in no way suggests that the government should not be able to amend its bill of particulars as it sees fit, we do hold that, if the government chooses to change its strategy at successive trials, and contradict its previous theories of the case and version of the historical facts, the jury [are] entitled to be aware of what the government has previously claimed, and accord whatever weight [they deem] appropriate to such information").

At least two State courts and the District of Columbia have also recognized that in certain circumstances a prosecutor's prior statements may be admissible as admissions against interest by a party-opponent. See *Harris* v. *United States*, 834 A.2d 106, 120 (D.C. 2003) ("The language of the party admission rule provides no basis for creating a prosecutorial exception or an exception where the government is the party opponent. . . . [T]he prior statements of an Assistant United States Attorney can be treated as party admissions"); *State* v. *Cardenas-Hernandez*, 219 Wis. 2d 516, 531 (1998) ("We find persuasive the reasoning of *Salerno* and *McKeon*. We therefore refuse to adopt a per se prohibition on the use of prior statements of prosecutors as admissions of a party-opponent . . . We agree that to adopt such a rule could invite abuse and sharp practice by prosecutors and could weaken the public's confidence in the justice system itself by denying the function of trials as truth-seeking proceedings"); *Hoover* v. *State*, 552 So. 2d 834, 838, 840 (Miss. 1989) (prosecutor's statements at earlier trial of codefendant that codefendant killed victim should have been admitted in evidence at defendant's subsequent trial).

To be sure, not every inconsistent statement by a prosecutor is admissible in evidence. "The defense is allowed to introduce a prosecutor's statement from a prior trial when: (1) the prosecution offered an inconsistent assertion of fact at the prior trial; and (2) the prosecution can offer no 'innocent' explanation for the contradiction." *United States* v. *Orena*, 32 F.3d 704, 716 (2d Cir. 1994). See Poulin, Party Admissions in Criminal Cases: Should the Government Have to Eat Its Words?, 87 Minn. L. Rev. 401, 443 (2002). Thus, a prosecutor's assertion of fact is not inconsistent and therefore not admissible where the prosecutor at a subsequent trial offered "additional, not conflicting,

theories" as to the defendant's motivation to commit the murder. *Orena, supra.* Nor would an inconsistent assertion of fact be admissible where new evidence was discovered after the first trial that caused the prosecutor to alter his understanding of the facts of a case. See *United States* v. *James,* 712 F.3d 79, 86 n.1, 102-103 (2d Cir. 2013) (government provided "innocent explanation" for inconsistency between its stated position at earlier trial and at subsequent trial where defendant in first trial, after conviction, proffered new information that led government to different view as to her culpability for murder). And a judge always retains the discretion to determine whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice to the Commonwealth. See *Ruszcyk* v. *Secretary of Pub. Safety,* 401 Mass. 418, 422-423 (1988); Mass. G. Evid. § 403 (2013).

Applying these principles to this case, it is plain that the prosecutor's statements in closing argument at the Sok trial that Sok was the shooter is an assertion of fact that is inconsistent with his statements in closing argument at the Keo trial that Keo was the shooter. The court contends that the prosecutor's statements are not inconsistent because, in both trials, he argued that the defendant was guilty regardless of whether he was the shooter or an aider or abettor, but any fair reading of the prosecutor's closing arguments would reveal that he made a forceful factual (and inconsistent) assertion that the defendant on trial was the shooter; he did not merely identify the evidence supporting the theory that the defendant on trial was a shooter and the theory that he was an aider and abettor.[4]

Because the defendant did not seek to offer in evidence the prosecutor's inconsistent assertion that Sok was the shooter, the

---

[4]The court, citing *United States* v. *Orena,* 32 F.3d 704, 716 (2d Cir. 1994), claims that "even under the law of the Second Circuit, a transcript of the prosecutor's closing argument from Sok's trial would not have been admissible at the defendant's trial because the Commonwealth properly presented alternative (albeit inconsistent) theories of liability in each trial and in so doing presented different theories that as a matter of law are not contradictory." *Ante* at 42. The court also claims that the "dissent ignores this law." *Ante* at 42. In fact, the court badly misreads the *Orena* case and, in doing so, mischaracterizes the law of the Second Circuit.

In *Orena, supra* at 716, the prosecutor in the first trial said that the victim was murdered because he was skimming loansharking proceeds; at Orena's

prosecutor did not have an opportunity to offer an "innocent" explanation for his contradictory assertions of fact at the two trials. Even though essentially the same evidence was offered at both trials, the prosecutor should be given this opportunity, which requires remand of the case to the trial judge.[5,6] Unless

---

trial, he offered the same claimed motivation, as well as two alternative motivations, to kill the victim:

> "At Bonfiglio's trial, the prosecution postulated that Ocera was murdered because he was skimming loansharking proceeds. At Orena's trial, the prosecution proffered three bases for Ocera's murder: (1) Ocera was skimming loansharking proceeds; (2) Ocera had not been able to retrieve the loansharking records seized from his restaurant by the Suffolk County police; and (3) Orena wanted to ingratiate himself with John Gotti, then the boss of the Gambino family, who for his own reasons wanted Ocera to be killed. Thus, the prosecution at Orena's trial offered additional, not conflicting, theories for the Ocera murder. Further, there is no showing that evidence was introduced at the Bonfiglio trial that would have justified arguing the additional theories to the jury in that case. Accordingly, the district court properly excluded the prosecution's opening statement at Bonfiglio's trial from being admitted in evidence at Orena's trial."

Offering additional possible motivations for a victim's murder is a world apart from changing position as to who shot the victim.

The court also cites support for its position, albeit with a "cf." citation, from *State* v. *Williams*, 79 Wash. App. 21, 30-31 (1995), where the Court of Appeals of Washington concluded that a judge erred in allowing a prosecutor to admit in evidence a defense lawyer's stipulation that his client's defenses would be "[g]eneral denial, entrapment." *Ante* at 42. The *Williams* court stated, "We hold only that when an attorney is permitted to state alternative or inconsistent defenses on behalf of his or her client, the statement does not qualify as the admission of a party opponent." *Williams, supra.* The fact that the court looks to this case for support reflects how little support the court has for its position.

[5]Though, as the court notes, *ante* at 43, "we do not have the benefit of an affidavit of the prosecutor" explaining why he told the jury in the Sok trial that Sok was the shooter and the jury in the Keo trial that Keo was the shooter, the Commonwealth suggests, and the court agrees, that the jury verdict in the Sok trial that Sok was guilty as a joint venturer justified the change. Even if the prosecutor were to offer this explanation, it is the role of the trial judge, not this court, to determine whether it is credible and whether, in the absence of newly discovered evidence, it suffices as an innocent explanation for the prosecutor's 180 degree shift in his theory of the case.

[6]The court states that the dissent "misstates the evidence the prosecution had at Sok's trial that was used to establish that Sok was the shooter," *ante* at 44, although it does not identify any misstatement and I am not aware of any. As best I can tell, the thrust of this paragraph is that the fact that Am testified

the prosecutor can provide an "innocent" explanation, the jury in this case were entitled to know that the prosecutor in his closing argument at the Sok trial had told the Sok jury what Keo's attorney had told the Keo jury — that Sok was the shooter — and give this inconsistent statement whatever weight they believe it deserved.

2. *Prejudice from the failure to admit this evidence.* The court states that, even if it were error to not admit this evidence, the error was "not likely 'to have unfairly influenced the jury's verdict.' " *Ante* at 44-45, quoting *Commonwealth* v. *Johnson,* 429 Mass. 745, 754 (1999). I recognize that the evidence was sufficient to convict the defendant on a joint venture theory if the jury were to have learned of and adopted the prosecutor's earlier inconsistent statements that Sok was the shooter. But the sufficiency of the evidence of joint venture does not mean that the defendant was not prejudiced by the jury's failure to learn of the prosecutor's inconsistent statements as to who was the shooter. As noted earlier, to convict Keo as an aider and abettor of premeditated murder, the jury would have needed to find beyond a reasonable doubt that, when the fatal shot was fired, Keo, with premeditation, shared Sok's intent to kill the victim. The difficulty in proving this theory beyond a reasonable doubt was that the victim was not killed immediately after he first left the restaurant, but only after he unexpectedly returned to the restaurant and fought with Keo, Sok, and their two fellow gang members inside the restaurant. If Sok was the shooter, the jury would have needed to consider whether Keo and Sok devised a plan to kill the victim that Sok did not attempt when the victim first left the restaurant, or whether Keo, during or immediately after the fight in the restaurant, somehow directed Sok to kill the victim even though they were many feet apart at the time of the killing and there was no evidence of any verbal communication between them in the moments that preceded the shooting. The evidence was sufficient to permit the jury to find that Keo

at Keo's trial that Sok said, "I think I shot a crab," where she was not sure who made this statement at Sok's trial, provides an "innocent explanation" for the prosecutor's change in position at Keo's trial that Keo, not Sok, was the shooter. Since this evidence more strongly pointed to Sok as the shooter, I cannot see how this can possibly explain the prosecutor's new assertion that Keo was the shooter.

directed Sok to shoot the victim, but the *weight* of the evidence of Keo's premeditation and intent to kill was far weaker if Sok was the shooter rather than Keo. Where Keo's strategy at trial was to argue that Sok was the shooter, no doubt because he recognized the difficulty of proving beyond a reasonable doubt that Keo was guilty as an aider and abettor if the jury found that Sok was the shooter, it is unreasonable for the court to conclude that Keo was not unfairly prejudiced by the jury's inability to weigh the prosecutor's declarations at the earlier trial that Sok was the shooter.[7]

3. *Is the verdict consonant with justice under G. L. c. 278, § 33E?* The court concludes, among other reasons, that the verdict is consonant with justice under G. L. c. 278, § 33E, because the defendant's counsel cannot be found ineffective for failing to seek to admit evidence that we have yet to declare admissible. *Ante* at 41-46. Under our broad authority in capital cases under G. L. c. 278, § 33E, we may order a new trial where "the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require." In view of the breadth of this authority, I do not believe the court needs to decide whether defense counsel was ineffective for failing to recognize that the court might conclude, as did the Court of Appeals for the Second Circuit and various State courts, that an inconsistent factual statement of a prosecutor in an earlier closing argument is admissible where there is no "innocent" explanation for the inconsistency. Regardless of whether counsel was ineffective for failing to offer this evidence, the fact remains that: (1) the prosecutor's statements in closing argument in the Sok trial that Sok was the shooter may have been admissible; (2) the admission of this evidence would have substantially bolstered defense counsel's argument that Sok was the shooter; and (3) we cannot be certain, or even confident, that the jury would have found

---

[7]Where I have twice in my dissent recognized that the evidence was sufficient to convict Keo on a joint venture theory if Sok was the shooter, I fail to understand how the court can state that the dissent attempts "to extinguish any accomplice or joint venture type of liability." *Ante* at note 23. My disagreement with the majority rests in their unwillingness to recognize the prejudice that arises from the jury not learning that the prosecutor earlier declared that Sok was the shooter, not the sufficiency of the evidence of joint venture.

Keo guilty of murder in the first degree as an aider and abettor if they had a reasonable doubt whether Keo was the shooter. This alone is more than sufficient to justify remand to the trial judge to determine whether the prosecutor had an "innocent" explanation for arguing that Keo was the shooter after having earlier argued that Sok was the shooter. If there is no "innocent" explanation, this conviction is not consonant with justice and must be vacated, so that a new trial may be conducted where the jury learns that, when Sok was on trial, the prosecutor argued that Sok was the shooter.[8]

To affirm this conviction without first remanding it is to affirm that the truth does not matter in criminal trials, that a prosecutor who lacks an "innocent explanation" may, without consequence, argue in one trial that one codefendant is the shooter where that theory will more easily lead to that codefendant's conviction and, in another trial, argue that a different codefendant is the shooter where that approach offers an easier path to securing a conviction. In short, I am convinced that affirming this conviction without first remanding it "would not only invite abuse and sharp practice [by prosecutors] but would also weaken confidence in the justice system itself by denying the function of trials as truth-seeking proceedings." *Salerno*, 937 F.2d at 811, quoting *United States* v. *McKeon*, 738 F.2d 26, 31 (2d Cir. 1984). Therefore, I respectfully dissent.

---

[8] The court appears to state that there can be no substantial likelihood of a miscarriage of justice where the defendant "was not deprived of his constitutional right to present a case" or, alternatively, where the evidence was legally sufficient to support a conviction on a joint venture theory. *Ante* at 45-46. Neither assertion accurately reflects our law.