NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11702

COMMONWEALTH  vs.  FRANKIE HERNDON.


Suffolk.     March 11, 2016. - August 26, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, & Hines, JJ.[1]


Homicide.  Firearms.  Evidence, Identification.  Identification.
    Practice, Criminal, Capital case, Sequestration of
    witnesses, Public trial.  Constitutional Law, Public trial.



    Indictments found and returned in the Superior Court
Department on December 19, 2011.

    The cases were tried before Patrick F. Brady, J.


    Theodore F. Riordan (Deborah Bates with him) for the
defendant.
    Teresa K. Anderson, Assistant District Attorney (Joseph F.
Jimezic, Assistant District Attorney, with her) for the
Commonwealth.


    BOTSFORD, J.  A Superior Court jury found the defendant,

Frankie Herndon, guilty of murder in the first degree of Derrick

Barnes on the theory of deliberate premeditation and of

_____

    [1] Justices Spina and Cordy participated in the deliberation
on this case prior to their retirements.

possession of a firearm without a license.  On appeal, the defendant challenges (1) the failure of the judge to instruct the jury on eyewitness identification in accordance with the defendant's requested instruction that was created after State v. Henderson, 208 N.J. 208 (2011), and that presaged this court's provisional eyewitness identification instructions set forth in Commonwealth v. Gomes, 470 Mass. 352 (2015); (2) the admission in evidence, through the testimony of two police officers, of an alleged out-of-court identification of the defendant and his codefendant, Frederick Henderson, by a witness although that witness did not testify concerning that alleged identification; and (3) the naming of the defendant's sister as a witness, which resulted in her sequestration from the court room.  We affirm the defendant's convictions.

Background.  From the evidence presented, the jury could have found the following facts.  At some point before moving with their family to a town outside Boston, the victim and his brother Darryl Barnes (Darryl) had lived on Fayston Street in the Dorchester section of Boston.  On August 27, 2011, Darryl and the victim returned there to visit people they knew from childhood and who were participating in a festival in Boston. Between approximately 5 and 5:30 P.M., Darryl parked his automobile on the street.  The victim and Darryl left the vehicle and walked along the street, where they met their cousin

Rondale Williams.  The victim, Darryl, and Williams continued to walk and stopped in front of one house on the street.  After a few minutes, Darryl left to drive another cousin home.  Shantee Griffin, who stayed with her mother next door, approached where the victim and Williams were talking, and the victim introduced himself to Griffin.

At some point, the victim and Williams moved to the area of a front porch directly across the street.[2]  Williams was on the porch while the victim was standing on the stairs leading up to the porch with another man and a woman.  At 7:05 P.M., the defendant and Henderson walked along the street and stopped at the porch steps.  Words were exchanged among the defendant, Henderson, and the victim for less than a minute, but long enough for the victim to say, "I'm saying, mother, you want to holler at me, holler at me then" and for the defendant to say, "[N]ow, what's up with that rattin' shit?"  After this exchange, the defendant and Henderson each drew a gun and fired multiple shots at the victim,[3] and the victim fell.  The defendant turned

---

[2] The police obtained video footage from cameras that had captured images of the street around the time of the shooting. The images showed two men approach the porch steps around 7:05 P.M. and the victim being shot multiple times by at least one of the two men.  However, the identities of the shooters could not be determined from the video.

[3] Shantee Griffin testified that the defendant shot the initial shots; Rondale Williams stated Henderson fired the initial shot.

and began to walk away but then turned back to the stairs of the porch, and as the victim put his arm up, the defendant shot the victim again. The defendant then put away the gun he was holding and "walked off like normal."

Williams ran from the porch to a nearby house and telephoned 911. Griffin, who was on the sidewalk in front of another nearby house during the shooting, also telephoned 911. She handed the telephone to a resident of Fayston Street, proceeded to where the victim was lying, and applied pressure on his chest in an attempt to stop the bleeding. Darryl returned minutes after his brother had been shot and ran to where the victim was lying. Minutes later, Boston police and emergency medical services responded to the scene. The victim, who was alert but unable to respond, was transported to a hospital, where he was pronounced dead not long after his arrival. He had received five gunshot wounds, including fatal wounds to the head and in the area of his right lower leg. Ballistic examination of shell casings found at the scene revealed that two different guns were used in the shooting.

The Commonwealth's theory of the case was that the defendant and Henderson shot the victim because in 2009 the victim had testified, revealing information contrary to the defendant's "no snitching code." According to the defendant, "bad things" happen to snitches and they could get shot.

Although the defendant and the victim grew up together and were together almost every day until 2009, after 2009 they "stopped hanging out."

The evidence pointing to the defendant and Henderson as the two men who shot and killed the victim primarily consisted of identifications allegedly made by Griffin and Williams. The Commonwealth called both Griffin and Williams to testify at trial, but neither of them identified the defendant or Henderson as a shooter in their trial testimony. Rather, the evidence of identifications, in Griffin's case, consisted of the following: (1) testimony by Sergeant Detective James J. Wyse that he spoke with Griffin by telephone on the night of the shooting and she identified "Jigga" (the defendant) and "Drano" (Henderson) as being the two men involved in the shooting and Jigga as the shooter;[4] (2) evidence of Griffin's recorded statements to Wyse and Detective Jeramiah Benton a few days after the shooting where she identified the defendant and "Drano" as the two men who approached the porch steps and the defendant as the man who

---

[4] Two other officers who spoke with Griffin on the night of the shooting also testified at trial. While still at the scene of the shooting, Griffin told one officer that she heard gunfire but saw nothing. Another officer also spoke with Griffin at the scene, and she told him that she was in front of her house when the shooting happened and that she saw one shooter. She further stated that she did not want to speak with him at that moment but provided him with her telephone number and told him that he could telephone her.

shot the victim several times;[5] and (3) Griffin's grand jury testimony -- about which she was questioned at trial and a redacted copy of which was introduced as an exhibit again identifying the defendant and Henderson as being at the scene of the shooting and the defendant as the shooter.[6,7]

As for Williams, the evidence of his identifications consisted of testimony by the two Boston police detectives, Benton and Wyse, about statements Williams made during an unrecorded interview they conducted of him on September 2, 2012, in the apartment of Williams's mother. According to the detectives' testimony, Williams identified "Drano" as firing the first shot and "Jigga" as firing subsequent shots.

The defendant testified. He stated that on the day in question, he was at a festival where he met friends, including Thell Valentine. He then left with Valentine and went to Valentine's apartment around 5 P.M. They stayed at Valentine's apartment for a while and then drove around until about 11:30 P.M. Valentine's testimony corroborated this timeline and more

---

[5] The interview was tape recorded and the recording was admitted in evidence as an exhibit.

[6] At trial, Griffin claimed that she felt pressured to answer questions a certain way during police questioning and at the grand jury.

[7] Although Griffin testified before the grand jury that she was directly across the street when the shots occurred, the surveillance video shows Griffin farther down the street.

specifically explained that he and the defendant were still at his apartment at the time of the shooting and left his apartment around 8 P.M.[8]

The defendant was sentenced to life in prison on the murder charge and a concurrent term of from four to five years in prison for unlawful possession of a firearm.[9]  The defendant filed a timely notice of appeal.

Discussion.  a.  Eyewitness identification instruction. The defendant requested an instruction on eyewitness identification that was essentially identical to the instruction that was developed after the New Jersey Supreme Court's decision in State v. Henderson, 208 N.J. at 298-299.  See Gomes, 470 Mass. at 357 n.10.  The judge declined to give the defendant's requested instruction, stating that he would use the model instruction provided in Commonwealth v. Rodriguez, 378 Mass. 296, 310-311 (1979) (Appendix), S.C., 419 Mass. 1006 (1995).[10]

---

[8] Henderson similarly presented an alibi defense, but did not testify.

[9] The second offense and armed career criminal portions of the conviction of possession of a firearm were dismissed on motion of the Commonwealth and with the defendant's assent.

[10] The judge further responded to the defendant's requested identification instruction by stating, "I read it.  I considered it.  Maybe good, maybe considered better, but not by me.  I'm just going with what I have [the Rodriguez instructions]."  The judge clarified, however, that "[t]hat doesn't mean that [defense counsel] can't argue numerous other factors that may have affected the ID."

The defendant claims that the judge erred by giving the model instruction in Rodriguez, rather than the instruction he requested, especially in light of this court's recent adoption of the more inclusive instructions provisionally adopted in Commonwealth v. Gomes, 470 Mass. at 376.[11]  See id. at 379-388 (Appendix).  Because the defendant objected to the judge's eyewitness identification instruction, we review for prejudicial error.  See Commonwealth v. Meas, 467 Mass. 434, 454, cert. denied, 135 S. Ct. 150 (2014).  We conclude that the judge did not abuse his discretion in denying the defendant's proposed instruction and therefore that there was no prejudicial error. See Gomes, supra at 359.

Similar to the instruction adopted in Gomes, the defendant's requested instruction contained various principles regarding the reliability of eyewitness identification and human memory that were not included in the Rodriguez instruction:  (1) human memory is not like a video recording; (2) a witness's level of confidence may not be an indication of the reliability of the identification; (3) the accuracy of the identification may be affected by a witness's stress at the time of the crime, the presence of a weapon distracting the witness's focus, and

_____

[11] Following our decision in Commonwealth v. Gomes, 470 Mass. 352, 376 (2015), we approved a new model instruction on eyewitness identification that includes some revisions to the Gomes provisional instruction.  See Model Jury Instructions on Eyewitness Identification, 473 Mass. 1051 (2015).

any influence of alcohol or drugs; and (4) information provided to a witness by other witnesses or outside sources may affect the reliability of the witness's identification.  Each of the factors raised by the defendant's alternative instruction is supported by the scientific principles regarding eyewitness identification summarized in the Report and Recommendations of the Superior Judicial Court Study Group on Eyewitness Evidence (report);[12] the report served as the impetus for the provisional instructions in Gomes and the Model Jury Instructions on Eyewitness Identification, 473 Mass. 1051 (2015).  As we recently noted in Commonwealth v. Navarro, 474 Mass. 247 (2016), however, the report itself does not represent a binding statement of governing law, and neither the provisional nor the new model eyewitness identification instructions were in existence at the time of the defendant's trial.  See id. at 253.  Thus, despite the alignment of the defendant's proposed instruction with the report's conclusions and our new instructions, we look to the law in effect at the time of the defendant's trial, and the judge acted well within his discretion in using the Rodriguez instruction.  See Navarro, supra at 251.

---

[12] Supreme Judicial Court Study Group on Eyewitness Evidence:  Report and Recommendations to the Justices (July 25, 2013), http://www.mass.gov/courts/docs/sjc/docs/eyewitness-evidence-report-2013.pdf [http://perma.cc/WY4M-YNZN].

Like the defendant here, the defendant in Gomes requested a more expansive eyewitness identification instruction than the Rodriguez model instruction, based on the New Jersey Supreme Court's analysis in the Henderson decision. Although the provisional instruction we adopted in Gomes included most of the points or principles relating to eyewitness identification instruction that were discussed in Henderson, 208 N.J. at 245-276, 298-299, we did so explicitly on a prospective basis, Gomes, 470 Mass. at 376. We concluded that the judge in that case did not err in declining the defendant Gomes's instruction request and using the model Rodriguez charge, where the defendant had failed to provide the judge "with any expert testimony, scholarly articles, or treatises that would reasonably have enabled the judge to determine whether the principles in the defendant's proposed instruction were 'so generally accepted' that it would be appropriate to instruct the jury regarding them." Gomes, supra at 359-360. The defendant in the present case is in the same position as the defendant in Gomes, having presented no evidence to demonstrate that the principles in his requested instruction were so generally accepted that the judge was obliged to give that instruction; defense counsel's reference to instructions sparked by the Henderson case alone did not satisfy this requirement. See Gomes, supra at 357 n.10. The judge here did not abuse his

discretion or otherwise err in declining to give the defendant's requested eyewitness identification instruction and giving instead a version of the model <u>Rodriguez</u> instruction. See <u>Commonwealth</u> v. <u>Bastaldo</u>, 472 Mass. 16, 18 (2015).[13]

The defendant alternatively argues that the judge declined to adopt the defendant's proposed eyewitness identification instruction because the judge incorrectly believed he had no authority to do so. He avers that the judge's failure to give the proposed instruction based on this legally erroneous belief

---

[13] The defendant claims that, despite the explicit directive for prospective application of the provisional instruction in <u>Gomes</u>, this court nonetheless may apply the instruction retrospectively. The defendant relies on <u>Commonwealth</u> v. <u>Brescia</u>, 471 Mass. 381, 392 (2015), and <u>Commonwealth</u> v. <u>Rivera</u>, 82 Mass. App. Ct. 839, 844-848 (2012), to make his point. The two cited cases presented different issues from those in this case. In <u>Brescia</u>, we concluded that the motion judge properly granted a new trial not because of a retrospective application of a new rule of law adopted after the defendant's trial, but because, given that the defendant had suffered a stroke during his trial, "the fairness of [the] trial was hampered by an extraordinary confluence of factors." <u>Brescia</u>, <u>supra</u> at 392. In <u>Rivera</u>, the Appeals Court applied instructions announced by this court in <u>Commonwealth</u> v. <u>Berry</u>, 457 Mass. 602, 617-618 (2010), <u>S.C.</u>, 466 Mass. 763 (2014), a case decided after the trial in <u>Rivera</u>, in order to prevent a substantial likelihood of a miscarriage of justice, where the change in instructions went to the heart of the defendant's case. <u>Rivera</u>, <u>supra</u> at 847-848. The instructions provided to the jury in the defendant's case neither threatened the integrity of the trial nor caused a substantial likelihood of a miscarriage of justice. Further, the provisional eyewitness identification instruction announced in <u>Gomes</u> did not create a "new rule" of constitutional law, warranting application to pending cases or those on direct appeal at the time <u>Gomes</u> was decided. Compare <u>Commonwealth</u> v. <u>Augustine</u>, 467 Mass. 230, 256-257 (2014), <u>S.C.</u> 470 Mass. 837 (2015), and 472 Mass. 448 (2015), and cases cited.

constituted reversible error, citing Commonwealth v. Harris, 443 Mass. 714, 728-729 (2005). The record does not support the claim that the judge operated under the mistaken belief that he lacked authority to adopt the requested instruction. To the contrary, the judge read and considered the proposed instruction, but ultimately denied the request because he preferred to use the model Rodriquez charge.

b. Introduction of Williams's pretrial statement of identification through detectives. i. Additional facts. During the presentation of its case, the Commonwealth called Williams as a witness. Toward the end of his testimony, the prosecutor asked him:

> Q.: "Mr. Williams, did you speak with homicide detective on the 2nd of September of 2011?"
>
> A.: "Don't know the exact date."
>
> Q.: "Did you speak with homicide detectives in the afternoon some day shortly after Derrick Barnes was murdered?"
>
> A.: "Not that I recall."

The prosecutor did not ask Williams any further questions about the meeting with the homicide detectives. Similarly, defense counsel did not ask any questions about such a meeting during his cross-examination of Williams. The Commonwealth then called Benton as a witness. Benton testified that he and Wyse met with

Williams on September 2, 2011.[14] He said that during the meeting, Williams identified Drano and Jigga as having walked up to the front of the porch on August 27, that Drano drew a gun and fired the first shot at the victim, and that subsequently Jigga also shot the victim. At a later point, Wyse similarly testified about statements Williams made to him and Benton identifying Jigga and Drano as the men who shot the victim.

The defendant objected to this evidence of Williams's identification, arguing that it was hearsay and could only be admitted for purposes of impeachment, and that the manner in which the evidence was being presented violated his constitutional right to confrontation. His counsel made the particular point that by failing to question Williams himself about the identification while Williams was testifying as a trial witness, the Commonwealth had deprived the defendant of his right to cross-examine Williams about it. The judge overruled the objection, and referencing Mass. G. Evid. § 801(d)(3)(C) (2016), the judge ruled that the evidence of Williams's identification reflected in Benton's testimony was admissible substantively. The judge suggested that the defendant was free to recall Williams as part of the defense case in order to further question him about the identification,

---

[14] The interview with Williams was not recorded. Wyse, whom the Commonwealth called as a witness following Benton, testified that Williams had declined to be recorded.

but that the judge would not require the Commonwealth to recall the witness for this purpose.

ii. Analysis. In this appeal, the defendant renews his argument that his right to confrontation under the United States and Massachusetts Constitutions was violated where the Commonwealth introduced evidence of Williams's alleged identification through third parties without first asking Williams, during the prosecutor's direct examination of Williams, about the identification. He claims that the constitutional error was not harmless beyond a reasonable doubt, and that he is entitled to a new trial as a result.[15]

For evidence of a witness's prior identification of a defendant (or another person) to be presented by a third party and admissible as substantive evidence at trial, it is essential that the identifying witness himself or herself be available to testify and subject to cross-examination about the alleged identification statement. See Commonwealth v. Cong Duc Le, 444 Mass. 431, 437-439 (2005); Mass. G. Evid. § 801(d)(1)(C). See also United States v. Owens, 484 U.S. 554, 559-560 (1988).

---

[15] Because the jury found Henderson guilty of murder in the first degree, the defendant argues that the jury must have credited Williams's identification given that his identification, as testified to by Benton and Wyse at trial, was the only evidence that identified Henderson as a shooter. Griffin, who provided the only other identification evidence at trial, implicated only the defendant as having shot the victim, not Henderson.

Neither Cong Duc Le nor any subsequent case, however, has considered the question whether, before a third party is permitted to testify about an identification witness's alleged prior identification, the identification witness must first be called to testify about the circumstances of that earlier identification and be subject to cross-examination. We conclude that this ordering of presentation of witnesses is not constitutionally required, but in the trial of criminal cases after this case, as a matter of criminal procedure, the Commonwealth shall be required to question a putative identification witness concerning an alleged prior identification before it seeks to introduce substantive evidence of that identification through a third party, thereby providing direct notice to the defendant of the issue and an opportunity for the defendant to cross-examine the putative identification witness in a timely manner. In this case, however, the fact that the prosecutor did not inquire specifically of Williams about his alleged prior identification during the interview the detectives conducted on September 2, before Benton and Wyse testified on that topic, did not constitute reversible error.

In Cong Duc Le, we adopted Proposed Mass. R. Evid. § 801(d)(1)(C), which provides that statements of identification are admissible substantively so long as "[t]he declarant testifies at the trial or hearing and is subject to cross-

examination concerning the statement," regardless of whether the witness admits, denies, or does not remember the statement. Cong Duc Le, 444 Mass. at 436, quoting Proposed Mass. R. Evid. § 801(d)(1)(C). Accord Commonwealth v. Spray, 467 Mass. 456, 470 (2014) ("Testimony by a third party, such as a police officer, regarding a witness's extrajudicial identification is substantively admissible if the identifying witness is unable or unwilling to make an identification in court and is available for cross-examination" [citation omitted]).[16]

This evidentiary rule undoubtedly implicates a defendant's constitutional right to confrontation. See Cong Duc Le, 444 Mass. at 437-439. See also California v. Green, 399 U.S. 149, 155-158 (1970). This court and the Supreme Court of the United States have made clear that the confrontation clause requires that a full opportunity be available to cross-examine the declarant witness about the statement. See Owens, 484 U.S. at 559 (defendant must have full and fair opportunity to bring out

---

[16] The proposed evidence rule set out in Mass. G. Evid. § 801(d)(1)(C) (2016) applies to an out-of-court identification based on a witness's familiarity with the person identified and is not limited to identifications made through a photographic array, show-up, or other formal identification procedure. See Commonwealth v. Adams, 458 Mass. 766, 770-772 (2011). Further, the proposed rule is not intended to render a witness's entire statement admissible, but only those parts of the statement necessary to provide a reasonable context for the identification. Id. at 772. The trial judge adhered to this limitation.

witness's bad memory and other facts tending to discredit his testimony such as "witness'[s] bias, his lack of care and attentiveness, his poor eyesight"); Cong Duc Le, supra at 438 (requirement under Mass. G. Evid. § 801[d][1][C] "would be satisfied as long as the witness is placed on the stand, under oath, and responds willingly to questions" [quotation and citation omitted]).  But this court has never required that a full opportunity to cross-examine must follow a prosecutor's asking the witness about the alleged identification on direct examination.[17]  A meaningful opportunity to cross-examine does not "guarantee a 'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish,'" Cong Duc Le, supra at 438, quoting Owens, supra at 559.

Where a defendant retains the opportunity to recall the declarant witness, a number of other States are in accord that

---

[17] In Commonwealth v. Machorro, 72 Mass. App. Ct. 377, 379-381 (2008), the Appeals Court held that an officer's testimony about a witness's extrajudicial identification was admissible even though the witness had not testified at trial specifically about the identification.  Although the facts in Machorro are distinguishable from this case -- the declarant witness there "testified at trial that she was 'pretty sure' the man who was arrested was the same man who had assaulted her," id. at 381, and therefore defense counsel had the opportunity to cross-examine the witness as to the basis for this belief -- the Appeals Court's decision illustrates the shift toward the admissibility of extrajudicial identifications as substantive evidence, a substantial change from cases decided by the Appeals Court before our decision in Commonwealth v. Cong Duc Le, 444 Mass. 431 (2005).  See, e.g., Commonwealth v. Seminara, 20 Mass. App. Ct. 789, 796 (1985).

there is no violation of a defendant's constitutional right of confrontation if the prosecutor fails to ask the identifying witness about the identification on direct examination. See People v. Lewis, 223 Ill. 2d 393, 402-403 (2006) (based on plain language of criminal statute permitting prior identifications to be admitted in evidence substantively, no requirement that declarant testify about out-of-court identification before third party may testify about identification); Jones v. State, 410 Md. 681, 700 (2009) (where tape-recorded interview was offered in evidence substantively pursuant to State criminal statute permitting out-of-court statements of child victims, and defendant had opportunity to recall declarant for further cross-examination regarding taped interview but did not, defendant was not entitled to new trial); State v. Hoch, 189 Vt. 560, 562-563 (2011) (testimonial hearsay statement admitted after declarant testified did not violate confrontation clause where defense counsel was free to recall declarant witness for further cross-examination). But see Smith v. State, 669 A.2d 1, 7-8 (Del. 1995) (under State criminal statute permitting use of prior statements as substantive evidence where declarant is subject to cross-examination, "the statement must be offered into evidence no later than at the conclusion of the direct examination of the declarant").

Although not constitutionally required, we conclude that, moving forward, it is appropriate to require that the Commonwealth inquire directly of the alleged identifying witness about the alleged prior identification before introducing evidence of that alleged identification through a third-party witness. Cf. Smith v. State, 669 A.2d at 7-8. This sequence will provide the defendant specific notice of the prior identification, information that will permit the defendant to fully cross-examine the alleged declarant. The opportunity to recall the declarant witness after the statement has been introduced through a third party is too limited, and inappropriately places a "strategic burden on the non-offering party." Id. at 8. Further, the approach we adopt may reduce confusion for the jury by providing them with both versions of the events in a timely fashion, "leaving it to the jury to resolve the conflicting claims concerning that prior identification." Cong Duc Le, 444 Mass. at 440.[18]

_____

[18] We appreciate that this procedural rule is easier to state than it will be to apply in every instance. As the present case illustrates, the alleged identification witness may not recall the circumstances when he was alleged to have made a prior identification or, even if the witness recalls the circumstances, may not recall having made the alleged identification or may deny having done so. Here, despite the fact that Williams professed a lack of recall about meeting with Benton and Wyse soon after the shooting incident, it would have been appropriate for the prosecutor to have asked Williams specifically whether he recalled identifying Drano and Jigga as

For the reasons just summarized -- and as stated in note 17, _supra_ -- it would have been preferable for the prosecutor explicitly to question Williams during direct examination about the identification of the defendant and Henderson that Williams was alleged to have made during his interview by Benton and Wyse -- i.e., before the Commonwealth presented evidence of the identification through the testimony of the two detectives. Nonetheless, the ordering of the witnesses in this case did not constitute an error warranting reversal. First, the record demonstrates clearly that the defendant's trial counsel knew before trial of Williams's alleged statement identifying the defendant and Henderson because he had received a copy of a police report in which the identification was apparently set out. Second, Williams, of course, did testify at trial and was available for full cross-examination by the defense; there is nothing in the record to suggest that Williams was unable or unwilling to answer questions. Finally, the judge offered the defendant the opportunity to recall Williams in order to inquire about the alleged identification that was presented to the jury through the detectives' testimony.

In sum, the fact that the prosecutor did not inquire specifically of Williams about his alleged prior identification

---

both having come to the porch on August 27, and as both having shot the victim.

of the defendant and Henderson before Benton and Wyse testified about the identification did not deprive the defendant of the ability to cross-examine Williams on this issue. Although we recognize that the introduction of the identification evidence through the detectives without having first questioned Williams about the identification was perhaps ill-advised, in the circumstances of this case it cannot be deemed improper, and does not warrant reversal of the defendant's convictions.

c. Sequestration of the defendant's sister. On the first day of trial, the Commonwealth presented to the judge a photograph that a Boston police detective discovered on a page of the Web site Facebook,[19] on which the photograph appeared of Sudara Herndon (Sudara), the defendant's sister. The photograph, taken that day inside the court room, showed the defendant and Henderson in court and the Facebook page referred to them by their nicknames, Jigga and Drano. The prosecutor explained to the judge at a sidebar conference that the Facebook post "has reference to a number of things . . . that will be evidence in this case." Consequently, the prosecutor added Sudara to the Commonwealth's witness list, thereby making her subject to a sequestration order that was in place for all

---

[19] Facebook is a social networking Internet site that allows members to develop personalized profiles in order to interact and share information with other members. Commonwealth v. Walters, 472 Mass. 680, 688 n.19 (2015).

witnesses and prohibiting her from coming into the court room during the trial. The defendant argues that the judge abused his discretion by allowing the Commonwealth to add Sudara as a witness because this was a pretext to exclude her from the court room in violation of his constitutional right to an open court room. We disagree.

The rule of criminal procedure governing the sequestration of witnesses provides that "[u]pon his own motion or the motion of either party, the judge may, prior to or during the examination of a witness, order any witness or witnesses other than the defendant to be excluded from the court room." Mass. R. Crim. P. 21, 378 Mass. 892 (1979). A judge has "broad discretionary power to sequester witnesses." Reporters' Notes to Rule 21, Mass. Ann. Laws, Rules of Criminal Procedure, at 1597 (LexisNexis 2015). The judge reasonably found that the Facebook post of the photograph of the defendant and Henderson and referencing the two by nickname was enough to justify adding Sudara as a potential witness and thereby necessitating her exclusion, given that the nicknames were an issue at trial, and Sudara's Facebook page presented potentially probative evidence about it. The judge did not abuse his broad discretion in permitting the prosecutor to add Sudara to the Commonwealth's

witness list and thereby subject her to the general witness sequestration order.[20]

Review under G. L. c. 278, § 33E.  Based on a thorough review of the record in this case in accordance with our obligation under G. L. c. 278, § 33E, we conclude that there is no basis to grant the defendant a new trial or other relief.

Judgments affirmed.

---

[20] The defendant claims that because the Commonwealth already had overwhelming evidence of the nicknames alleged to have been used by the defendant and Henderson, any evidence from Sudara's Facebook page was unnecessary to prove its case.  We are not persuaded.  The addition of Sudara to the Commonwealth's witness list was made at the very outset of the trial.  Whether the Commonwealth's evidence of the nicknames was "overwhelming" may well not have been clear at that juncture.  Moreover, a party generally is permitted to introduce evidence that is relevant, even if other evidence exists on the same point.