NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11702

COMMONWEALTH  vs.  FREDERICK HENDERSON.


Suffolk.     November 8, 2019. - November 30, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, & Budd, JJ.[1]


Homicide.  Firearms.  Constitutional Law, Assistance of counsel,
    Identification.  Identification.  Evidence, Identity,
    Exculpatory, Expert opinion, Motive, Testimony before grand
    jury.  Witness, Expert.  Jury and Jurors.  Practice,
    Criminal, Capital case, Assistance of counsel, Instructions
    to jury, Argument by prosecutor, Transcript of testimony
    before grand jury, Grand jury proceedings, Jury and jurors,
    Challenge to jurors, Voir dire.


    Indictments found and returned in the Superior Court
Department on December 19, 2011.

    The cases were tried before Patrick F. Brady, J.; a motion
for a new trial, filed on February 11, 2015, was considered
by William F. Sullivan, J., and a motion for reconsideration was
heard by him.


    Dennis Shedd for the defendant.
    Cailin M. Campbell, Assistant District Attorney, for the
Commonwealth.

---

    [1] Chief Justice Gants participated in the deliberation on
this case prior to his death.

GAZIANO, J.  A Superior Court jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation.  The jury also convicted the defendant of unlawful possession of a firearm.  The Commonwealth alleged that the defendant and his codefendant fatally shot the victim, Derrick Barnes, when Barnes returned to his former neighborhood to visit with family and friends.[2]  The motive for the killing, according to the Commonwealth, was that the victim had "snitched" to law enforcement in an unrelated case.  The defendant asserted an alibi defense by presenting evidence that he dropped his niece off at a church event around the time of the shooting.

On appeal, the defendant challenges the convictions on grounds of ineffective assistance of counsel.  The defendant contends as well that he is entitled to a new trial because the judge erred in allowing the introduction of certain evidence, and because the judge abused his discretion in allowing the prosecutor to exercise a peremptory challenge.  For the reasons that follow, we affirm the convictions and conclude that relief under G. L. c. 278, § 33E, is not warranted.

---

[2] At a joint trial with the defendant, the codefendant was convicted of murder in the first degree and unlawful possession of a firearm.  We affirmed the convictions.  See Commonwealth v. Herndon, 475 Mass. 324, 337 (2016).

1.  Background.  We recite the facts the jury could have found, reserving certain details for our discussion of particular issues.  The victim and his brother, Darryl Barnes,[3] grew up in the Dorchester section of Boston.  In 2009, the victim testified in an unrelated criminal trial, and then moved to a town outside Boston.  Thereafter, the victim rarely visited his old neighborhood.

The defendant and the codefendant, who were friends, lived on the same street in the victim's former neighborhood.  The defendant was known by the nickname "Drano," while the codefendant was known as "Jigga."  During the time that the victim lived on the defendant's street, he "hung out" with the defendant and the codefendant.

On August 27, 2011, the day of a large festival in Boston, the victim and his brother returned to their former address to visit family and friends.  The brothers met up with their cousin, Rondale Williams, and some friends.  Darryl left to drive another cousin home.  The victim and Williams continued to walk down the street, and stopped to talk to Shantee Griffin.  Griffin, who had lived at her mother's house, at no. 14, for two years, knew Williams, and the victim was introduced to her as "Doughboy."  Eventually, the victim, Williams, another man, and

_____

[3] Because they share a last name, we refer to the victim's brother, Darryl Barnes, by his first name.

a woman gathered on the front porch of no. 11.  Griffin, who had left the victim and Williams, stood on the sidewalk in front of a house located across the street.[4]

At 7:05 P.M., two men, later identified as the defendant and the codefendant, walked down the street and stopped in front of no. 11.  The victim and the codefendant got into an argument.  The victim said, "I'm saying, mother, you want to holler at me, holler at me then."  The codefendant asked, "[N]ow, what's up with that rattin' shit?"  After this exchange, the codefendant and the defendant, standing side by side on the sidewalk, pulled out handguns and fired multiple shots at the victim.  The victim dropped to the floor.  Both assailants walked away from the porch.  The codefendant turned around, approached the fallen victim, and shot him again at close range.  The victim suffered five gunshot wounds, including a fatal wound to the head.

Griffin telephoned 911 and then attempted to aid the victim until police and emergency medical services arrived.  At the scene she told police that she had heard shots from across the street but had not seen the shooter.  She also provided police

---

[4] In a police interview and in her grand jury testimony, Griffin said that she had been positioned "across the street" from the house at no. 11, in the area of the houses at nos. 10-12.  While the motion judge found that Griffin had been standing outside her house at no. 14, home surveillance videotape footage later revealed that Griffin actually had been standing farther down the street, in front of no. 6.

with her telephone number. During a telephone interview on the evening of the shooting, Griffin told police the names of the two shooters. Williams was interviewed by police approximately a week after the shooting. He told police that he had been on the porch with the victim when the defendant and codefendant walked up onto the porch. The codefendant pulled out a gun and shot the victim, and then shot him again after he fell.

Police collected three expended .32 caliber shell casings at the crime scene, and recovered two .32 caliber projectiles from the victim's body. The casings were fired from the same firearm. The two projectiles, however, had been fired from two different weapons.

At trial, the Commonwealth called Williams and Griffin as eyewitnesses. Williams knew both the defendant and the codefendant. He had met the defendant in 2005, when the defendant "was going through a situation" and came to live with one of Williams's relatives. He had known the codefendant for approximately fifteen years. Williams testified that he had been on the front porch with the victim immediately prior to the shooting. He did not hear an argument prior to the gunfire. Williams testified that he could not identify anyone because he never looked at either gunman's face. He also said that he had been highly intoxicated that evening from drinking vodka, smoking marijuana, and "popping" pills, and that he had been

"rolling a blunt" when the shooters walked up.  Williams also testified that he could not remember talking to police the week after the shooting, when he identified the codefendant as the shooter.

Griffin testified that she did not know the defendant or the codefendant.  She said that she had heard gunshots, but did not see the shooting because she was looking in the opposite direction and, in any event, her view across the street had been obstructed.  She also testified that she had been pressured by a detective to testify falsely before the grand jury and to present information supplied by the police.

After the judge determined that Griffin and Williams were feigning a lack of memory or testifying inconsistently to prior recorded statements, the Commonwealth was allowed to introduce out-of-court statements, admitted substantively, that Williams and Griffin previously had identified the defendant.[5]  These

_____

[5] The judge allowed the substantive introduction of statements by Griffin and Williams to the grand jury "insofar as inconsistent with their trial testimony."  See Mass. G. Evid. § 801(d)(1)(A) (2020).  He also allowed the introduction as substantive evidence of out-of-court statements of identification made by Griffin and Williams to police.  See Mass. G. Evid. § 801(d)(1)(C).  The portions of Griffin's August 2011 telephone conversation with detectives that were not relevant to her identification of the perpetrators also were admitted, over the defendant's objections, but the jury were instructed that they were introduced for the limited purpose of establishing Griffin's state of mind.  The judge instructed that these other statements were admissible only on the issue whether Griffin's grand jury testimony and statements of identification

statements included Griffin's telephone call to police, Griffin's and Williams's statements to police during interviews, and Griffin's and Williams's grand jury testimony.

In his interview with investigators, introduced substantively, Williams stated that the defendant and the codefendant (whom he referred to as "Drano" and "Jigga," respectively) walked up to the porch at no. 11. After an exchange of words with the victim, the codefendant pulled out a gun and fired. Both men then started to leave. The codefendant turned around, returned to the porch, and fired several shots at the wounded victim.

On the evening of the shooting, Griffin told a responding patrol officer that she had heard shots but did not see anything. She told another officer that she had seen a single shooter run away from the scene. Later that evening, a detective telephoned Griffin to follow up on the information she had given the uniformed officers. During that conversation, Griffin said that there had been two assailants, whom she identified as "Drano" and "Jigga."

A few days later, detectives interviewed Griffin at Boston police headquarters. She told them that she had been standing on the opposite side of the street and had observed the

---

"were the result of pressure, coercion or suggestion by the police."

defendant and the codefendant (known to her as "Drano" and "Jigga") walk down the street. They said something to the victim (whom she knew as "Doughboy"). The codefendant then pulled out a gun and started firing at the victim. She did not see a firearm in the defendant's hand. She had known the defendant and codefendant "for about a year" from spending time on that street. At the end of the interview, the detectives displayed two photographs of the individuals they believed to be Drano and Jigga. Griffin identified the defendant as Drano and the codefendant as Jigga.[6]

On September 1, 2011, Griffin testified before the grand jury. She testified that she had lived on the same street for approximately two years. When she first moved in, a friend introduced her to the codefendant. The codefendant hung around at the top of the street, and Griffin would see him "almost every day." Griffin was less familiar with the defendant. During the two years that she had lived on the same street, in her mother's house, she had seen the defendant "three to four times." They had never had an actual conversation, but were familiar enough with each other to say hello.

---

[6] The photograph itself, which was introduced in evidence, shows that Griffin wrote on the back, "I know this to be DrainO."

The defendant, who lived with his sister and his niece, presented an alibi defense. On the evening of the shooting, his niece had been scheduled to dance at a church event, and the defendant agreed to take her there. His niece's father, the church pastor, telephoned at 7 P.M. to find out where she was, and was told that the defendant was on his way. The defendant dropped his niece off at the church at about 7:05 to 7:10 P.M., and returned to his apartment sometime between 7:20 and 7:25 P.M.

2. Discussion. The defendant raises three claims in this direct appeal from his conviction combined with his appeal from the denial of his motion for a new trial. First, he contends that he was deprived of the effective assistance of counsel, in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. Second, he argues that the judge erred in allowing a transcript of Griffin's grand jury testimony to be introduced in evidence. Third, the defendant maintains that the prosecutor impermissibly exercised a peremptory challenge to exclude an African-American juror.

a. Ineffective assistance of counsel. In his motion for a new trial, and in his supplemental motion, the defendant raised numerous claims of ineffective assistance by his trial counsel. In particular, the defendant argued that trial counsel was

ineffective because he (a) did not move to suppress Griffin's out-of-court identification; (b) did not present exculpatory evidence that would have called into question Griffin's ability to observe the shooters from across the street; (c) did not present testimony from an expert on eyewitness identification; (d) did not request a limiting instruction regarding the codefendant's motive to harm the victim for violating the "no snitching" code; and (e) did not object to misstatements in the prosecutor's closing argument.

The motion judge, who was not the trial judge,[7] ruled that the defendant had not established that trial counsel was ineffective; trial counsel's performance did not fall below that which could be expected from an ordinarily fallible lawyer; and the defendant had not been deprived of an otherwise available, substantial ground of defense. See Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).

In reviewing a claim of ineffective assistance of counsel in a case of murder in the first degree, we apply a more favorable standard of review than that described in Saferian. We use essentially the same standard as we would for an unpreserved error at trial, and determine whether there was error and whether it created a substantial likelihood of a

_____

[7] The trial judge had retired.

miscarriage of justice. See Commonwealth v. Vargas, 475 Mass. 338, 358 (2016). Otherwise put, "[w]e consider whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." Id., quoting Commonwealth v. Lessieur, 472 Mass. 317, 327, cert. denied, 577 U.S. 963 (2015). If a defendant's claim of ineffective assistance is based on a tactical or strategic decision, however, we apply the more rigorous standard providing that, to be ineffective, the attorney's decision must have been manifestly unreasonable. See Commonwealth v. Lang, 473 Mass. 1, 14 (2015); Commonwealth v. Kolenovic, 471 Mass. 664, 674-675 (2015), S.C., 478 Mass. 189 (2017).

i. Motion to suppress identification. "The failure of counsel to litigate a viable claim of an illegal search and seizure is a denial of the defendant's Federal and State constitutional right to the effective assistance of counsel" (citation omitted). Commonwealth v. Comita, 441 Mass. 86, 90 (2004). To prevail on an ineffective assistance of counsel claim on this basis, a defendant is required to demonstrate the existence of a viable claim and a likelihood of success on the merits if a motion to suppress had been filed. Id. at 90-91. Upon a finding that trial counsel did not file a motion to suppress where a defendant had a meritorious claim, a defendant

must demonstrate as well that admission of the evidence that could have been suppressed created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Fulgiam, 477 Mass. 20, 29, 36-37, cert. denied, 138 S. Ct. 330 (2017); Commonwealth v. Banville, 457 Mass. 530, 534 (2010).

Here, trial counsel provided an affidavit explaining his reasons for not filing a motion to exclude Griffin's out-of-court identification. He averred, "I thought a motion to suppress would not succeed because a judge would consider a dispute as to how often Griffin had seen [the defendant] to be a jury issue and an identification from a single photo is proper when the witness knows the perpetrator."

The motion judge found that counsel reasonably believed that a motion to suppress the identification would have had a minimal chance for success where there was evidence that the witness knew the suspect. See Commonwealth v. Carr, 464 Mass. 855, 871 (2013) ("the witnesses knew the defendant from the neighborhood and witnessed the shooting in broad daylight; it is unlikely that suggestiveness would have played much of a role in their identifications"); Commonwealth v. Adams, 458 Mass. 766, 770-771 (2011) ("Traditional identification procedures such as photographic arrays, showups, and lineups were designed primarily for witnesses who had never before seen a particular individual, or who may have seen the individual previously but

on a limited basis.  They are not normally used, and are not required, for witnesses who know an individual well").  On this basis, the judge concluded that trial counsel's decision did not deprive the defendant of an otherwise available, substantial ground of defense.

Where, as here, the motion judge was not the trial judge, and did not conduct an evidentiary hearing on the motion, we regard ourselves as in as good a position to assess the record as was the motion judge.  See Commonwealth v. Grace, 397 Mass. 303, 307 (1986).  After careful review of the record, we agree that the defendant did not establish that excluding the out-of-court identification likely would have influenced the jury's verdicts.  In her telephone conversation with police, and subsequent interview at police headquarters, Griffin identified Drano as one of the two men involved in the shooting.  The detectives displayed a single photograph of the defendant, and then a single photograph of the codefendant, to Griffin after she provided this information.  One of the detectives explained that he displayed the individual photographs in order to confirm that the individuals Griffin knew as Drano and Jigga were, indeed, the defendant and the codefendant.

In his reply brief, the defendant concedes that there was no doubt that he was known as Drano.  Three witnesses, Darryl, Williams, and the codefendant, also referred to the defendant by

this nickname.  Because the defendant has not shown that any error in choosing not to file a motion to suppress likely would have influenced the jury's verdicts, we need not address the issue whether trial counsel bypassed a meritorious motion to suppress the out-of-court identification.

ii.  Exculpatory evidence of misidentification.  The defendant argues that trial counsel should have introduced exculpatory evidence that Griffin provided police a description of Drano's height that did not reflect the defendant's actual height.  The defendant maintains that showing that portions of Griffin's description did not match the defendant's actual characteristics would have "provided objective support" for her testimony at trial that she had not seen the shooter.  In her telephone conversation with the detectives, Griffin described Jigga as a black male, aged twenty-seven to twenty-eight, about five feet, seven inches tall, with a dark mark on the right side of his cheek.  She described Drano as a black male in his twenties, with "brown" skin and a "low haircut," wearing a blue polo shirt.  Later, in her in-person interview, Griffin told detectives that Jigga is approximately five feet, seven inches to five feet, eight inches tall, and that Drano is shorter.  In response to further questioning, Griffin estimated that Jigga is approximately six feet tall, and Drano approximately two inches shorter.

Trial counsel acknowledged that "Griffin stated Drano was shorter than Jigga, but the booking sheets show that [they] are the same height" (both are listed as six feet tall in Boston police department booking sheets). Counsel explained that he did not attempt to elicit that evidence at trial because it would not have added much to the misidentification defense. Instead, in his closing argument, counsel focused on Griffin's trial testimony that she heard gunshots but did not see anything, and attempted to distance the testimony from Griffin's prior statements by arguing that she was a malleable witness, she had not been standing where she said she had been, and she had been so upset by her belief that her close friend had been killed that she had been unable to observe anything accurately. Counsel urged the jury to consider Griffin's demeanor and actions on the surveillance video footage as evidence that she would not have been in a position to identify anyone.

The motion judge determined that the failure to introduce the booking sheets did not deprive the defendant of effective representation. He noted that "the height difference was only a couple of inches at most. The jury had the opportunity to view both defendants together at trial and make their own observations."

In light of Griffin's trial testimony that she did not know the defendant, and did not see the shooters, trial counsel's

decision not to draw further attention to Griffin's previous statements of identification was not ineffective.

iii. <u>Expert on eyewitness identification</u>. The defendant challenges the adequacy of trial counsel's investigation of the Commonwealth's identification evidence. The defendant maintains that trial counsel was unable to make a reasonable tactical judgment as to how to challenge the eyewitnesses because he did not retain an expert witness to explore well-established factors contributing to mistakes in identification.[8]

Trial counsel did not file a motion for funds to retain an expert witness because he believed that the judge would have denied it based on Griffin's familiarity with the defendant. Counsel also believed that he would be able adequately to

---

[8] The defendant also claims that trial counsel rendered ineffective assistance because he should have joined the codefendant's request for an enhanced identification instruction based on <u>State</u> v. <u>Henderson</u>, 208 N.J. 208 (2011). In <u>Herndon</u>, 475 Mass. at 328, the codefendant argued that the judge erred in declining to give the requested instruction in light of the court's subsequent adoption of provisional enhanced identification instructions in <u>Commonwealth</u> v. <u>Gomes</u>, 470 Mass. 352, 376, 379-388 (2015) (Appendix), <u>S.C.</u>, 478 Mass. 1025 (2018). We concluded that the trial judge did not abuse his discretion because the codefendant had not provided the trial judge sufficient information to enable "the judge to determine whether the principles in the defendant's proposed instruction were 'so generally accepted' that it would be appropriate to instruct the jury regarding them. <u>Herndon</u>, <u>supra</u> at 329, quoting <u>Gomes</u>, <u>supra</u> at 359-360. The defendant cannot establish a substantial likelihood of a miscarriage of justice here, on the basis of his request for the same enhanced instruction, where he provided no information whatsoever as to the same point on which the codefendant's presentation was inadequate.

explore deficiencies in the identification evidence through cross-examination of the Commonwealth's witnesses.

The motion judge reviewed an affidavit submitted by an expert witness retained by postconviction counsel. The expert witness discussed the variables that can affect witness identifications generally and that might have influenced Griffin's and Williams's identifications of the defendant, including distance, lighting, exposure duration, stress, and intoxication. The expert opined that the presence of these risk factors increased the likelihood of misidentification.

The motion judge concluded similarly that the presentation of an expert witness would not have accomplished anything material for the defense. He noted first that trial counsel challenged the reliability of the pretrial identification evidence through cross-examination of the Commonwealth's witnesses. More importantly, the motion judge concluded that the ability of Griffin and Williams to identify the defendant was not the primary issue at trial. Both witnesses unequivocally testified that they did not observe the shooting itself and could not identify the assailants. The judge observed, "Rather, the issue before the jury was whether the eyewitnesses told the truth prior to trial when they identified [the defendant] as one of the shooters to the police and the grand jury or whether they were telling the truth at trial when

they testified that they previously lied and had not actually seen the shooters."

"The decision to call, or not to call, an expert witness fits squarely within the realm of strategic or tactical decisions." Commonwealth v. Ayala, 481 Mass. 46, 63 (2018), and cases cited. Here, the defendant has not established that trial counsel's decision not to retain an expert on eyewitness identification was manifestly unreasonable. See Commonwealth v. Watson, 455 Mass. 246, 257-258 (2009). The jury were required to resolve an issue of credibility, i.e., whether Griffin and Williams had been truthful, prior to trial, when they identified the assailants as Drano and Jigga. See Commonwealth v. Alvarez, 480 Mass. 299, 313, S.C., 480 Mass. 1015 (2018) (witness credibility was not appropriate subject of expert testimony). An expert witness's testimony concerning factors related to mistaken eyewitness identification would not have materially aided the defense; the jury did not need an expert to tell them that Griffin and Williams were perhaps mistaken due to external factors -- both testified that they did not closely observe the shooting and insisted that they had not been in a position to identify the suspects. See Ayala, supra at 65 ("we cannot say that trial counsel's decision not to call an expert on eyewitness identification was one that lawyers of

ordinary training and skill in criminal law would not consider competent" [quotation and citation omitted]).

    iv.  <u>Limiting instruction on motive evidence</u>.  Prior to both men opening fire, the codefendant asked the victim, "[N]ow, what's up with that rattin' shit?"  During cross-examination, the codefendant stated that snitches could be both a "bad thing" and a "good thing," but agreed with the proposition that "bad things" could "happen" to "snitches."  The codefendant responded affirmatively to the questions whether snitches could get "beat up," "stabbed," or even "killed," "depending on who they told on."  The prosecutor used the codefendant's testimony to argue that both defendants "were mad about [the victim] testifying, and bad things happen to snitches."

    Trial counsel did not request an instruction limiting the jury's consideration of the codefendant's testimony to the codefendant alone.  Counsel acknowledged, in his affidavit, that he "should have done so because there was no evidence that [the defendant] was aware that [the victim] had testified at a trial in 2009 or that he shared [the codefendant's] opinions about snitching."

    In <u>Commonwealth</u> v. <u>Keo</u>, 467 Mass. 25, 33 (2014), we discussed the admissibility of evidence bearing on a defendant's state of mind that a codefendant was motivated to kill the victim.  The disputed evidence in that case consisted of numbers

scrawled on the codefendant's bedroom wall purporting to signify a desire to kill members of a rival gang. Id. at 30, 32. We concluded that attributing the import of the writings on the codefendant's wall to the defendant was "problematic." Id. at 33. There was no evidence that the defendant saw the writings on the codefendant's wall and affirmed his willingness to harm members of the rival gang. Id.

Here, by contrast, there was circumstantial evidence from which the jury could infer that the defendant and the codefendant shared the same motive to kill the victim. The defendant stood side by side with the codefendant when the codefendant expressed displeasure about "rattin'." As soon as the codefendant made this statement, in effect accusing the victim of violating the "no snitching" code, both men produced firearms and shot the victim.

Moreover, the defendant cannot show that he was prejudiced by trial counsel's failure to request a limiting instruction. Motive is not an element of the crime of murder. See Commonwealth v. Carlson, 448 Mass. 501, 508-509 (2007). The Commonwealth introduced substantial evidence that the defendant shared the codefendant's intent to kill the victim. Producing a firearm and firing at the victim from close range is sufficient to establish such an intent. See Commonwealth v. Gonzalez, 475 Mass. 396, 416 (2016) (bringing firearm to lethal encounter

implied shared intent to kill); Commonwealth v. Rosa, 468 Mass. 231, 233-234 (2014) (defendant was one of three shooters seen firing at victim); Commonwealth v. Britt, 465 Mass. 87, 88-89 (2013) (intent to kill established where defendant brought gun to scene and fired at victim).

v. Prosecutor's closing argument. The defendant also argues that counsel was ineffective because he did not object to portions of the prosecutor's closing argument. We review this claim to determine whether any error in failing to object would have created a substantial likelihood of a miscarriage of justice. Vargas, 475 Mass. at 358. See Commonwealth v. Martinez, 476 Mass. 186, 198 (2017). Accordingly, we assess the closing argument "in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." Commonwealth v. Carriere, 470 Mass. 1, 19 (2014).

The defendant contends that the prosecutor misstated the evidence in discussing Griffin's testimony. In particular, in describing Griffin's familiarity with the defendant and the codefendant, the prosecutor argued, "But these are gentlemen who [Griffin] knew for essentially two years, but at least a year. On a daily basis [Griffin] saw both of these guys. She saw them on a daily basis." According to the defendant, this argument has no basis in the trial evidence, as there was undisputed

testimony that Griffin had seen the defendant only three or four times over the course of the two years that she lived on the defendant's street.

We agree that the prosecutor, in part, misstated the evidence with respect to Griffin's familiarity with the defendant. In her interview, Griffin told the police that she had known the defendant and codefendant "[f]or about a year."[9] In her grand jury testimony, Griffin said that she lived on the same street for two years. The prosecutor then asked, "How often, during the time that you lived [there], would you see or encounter [the defendant]?" She answered, "Three to four times." Thus, while the evidence could support the argument that Griffin had known the defendant over the course of two years, at no point did Griffin testify, or tell the police, that she had seen the defendant "on a daily basis."

The defendant also contends that the prosecutor misstated the evidence by arguing that Griffin testified that she saw the defendant shoot the victim. The prosecutor argued that the defendant was "the person in the [g]rand [j]ury [Griffin]

_____

[9] We reject the defendant's argument that this statement was admitted for the limited purpose of demonstrating whether Griffin's grand jury testimony was coerced. Griffin's familiarity with the defendant provided context for her identification of the suspect and, therefore, was admissible without limitation. See Commonwealth v. Adams, 458 Mass. 766, 772 (2011); Mass. G. Evid. § 801(d)(1)(C) (2020).

indicated, as well, was the person who shot [the victim]."  To the contrary, however, Griffin testified before the grand jury that the codefendant opened fire, and that she did not see a gun in the defendant's hand.  Thus, as the Commonwealth concedes, the prosecutor improperly misstated the facts.

In the context of the argument as a whole, however, we conclude that the improper statements did not create a substantial likelihood of a miscarriage of justice.  While they were misstatements on the critical issue of identification, these were relatively brief misstatements in a complicated case involving two defendants and testimony by reluctant witnesses. They were not repeated or emphasized, and would not have detracted significantly from the other, accurate statements about the identification evidence.  See Commonwealth v. Copeland, 481 Mass. 255, 264 (2019); Commonwealth v. Burgos, 462 Mass. 53, 72, cert. denied, 568 U.S. 1072 (2012).  In addition, the judge provided the jury with instructions that they were the sole and exclusive finders of fact, and that it is the jury's "collective memory [of the evidence] that controls," and not the memory of counsel.  The judge also instructed that the final arguments were just that:  "Arguments are arguments. They are not evidence."  See Commonwealth v. Goitia, 480 Mass. 763, 768 (2018); Commonwealth v. Rakes, 478 Mass. 22, 46-47 (2017); Commonwealth v. Kozec, 399 Mass. 514, 517 (1987).

b.  Admission of grand jury transcript.  The defendant
challenges the decision to allow the introduction of Griffin's
grand jury testimony on the ground that most of Griffin's trial
testimony did not contradict what she said before the grand
jury.

On direct examination, Griffin testified that she did not
recall testifying before the grand jury.  When presented with
excerpts of her grand jury testimony, she testified that she
either did not remember the events, or denied that she had made
those statements.  For example, she testified concerning her
familiarity with the defendant:

> Q.:  "And then you were asked a question [at the grand
> jury]:  'Ms. Griffin, during that period of time that you
> lived on [the defendant's] street, did you know an
> individual who went by the name of Drano?'  And the
> indication was yes.  Did I read that correctly?"
>
> A.:  "No."
>
> Q.:  "Did I read that correctly?"
>
> A.:  "Yeah, you read the paper."

After a sidebar conference, the judge allowed the
Commonwealth's motion to introduce the grand jury testimony
substantively because he found that Griffin's lack of memory was
feigned.  The prosecutor moved to introduce a copy of a
transcript of Griffin's grand jury testimony in evidence.  The
codefendant objected that introduction of the transcript would
"accentuate that which was presented once [to the jury] in

testimonial form" by what the prosecutor had read during his questioning of Griffin. The defendant joined this objection and added that he would be prejudiced by the cumulative presentation of evidence, much of which was duplicative but some of which had not been introduced at all. The judge overruled the objection, and allowed the transcript to be introduced substantively, pending any redactions the parties might seek.

Because the objection was preserved, we review the defendant's claim for prejudicial error. See Commonwealth v. Nardi, 452 Mass. 379, 396 (2008).

In Commonwealth v. Andrade, 481 Mass. 139, 141 (2018), we considered a claim that the Commonwealth improperly had presented grand jury testimony that was admitted as substantive evidence. As in this case, the prosecutor there "chose to read relevant excerpts from the transcripts, punctuated by questions to the witness as to whether [the witness] recalled giving the grand jury testimony." Id. We held that "although the prosecutor's method was unconventional," the judge did not err in allowing the jury to treat the grand jury testimony as substantive evidence. Id. at 144. In so holding, we noted that the preferable method of introducing prior testimony as substantive evidence is to "read [the transcripts] directly into the record either by one person reading the questions and a colleague reading the answers, or by one person reading the

entire excerpt but making clear which portions are questions and which are answers."  Id.

Based on our previous decisions, the judge believed that admission of a transcript to supplement oral testimony was a matter of his discretion.  See Commonwealth v. Maguire, 392 Mass. 466, 473 (1984); Commonwealth v. Bianco, 388 Mass. 358, 370, S.C., 390 Mass. 254 (1983); Commonwealth v. Mandeville, 386 Mass. 393, 404-406 (1982).  He did not have the benefit of the Andrade opinion to guide his decision.  If he did, the judge would have sustained the defendant's objection to the admission of the transcripts in evidence.

We discern no reversible error from the manner in which the grand jury evidence was presented to the jury.  The grand jury transcripts that were introduced as exhibits may have been cumulative of the excerpts presented to Griffin, and it would have been preferable to read the transcript in evidence as set forth in Andrade.  It is entirely speculative to assume, however, as the defendant argues, that the jury improperly focused on this transcript to the exclusion of contradictory evidence.[10]

---

[10] Moreover, to the extent the defendant argues, as he did in his motion for a new trial, that portions of the transcript were introduced that had not first been presented as questions to the witness before the jury, nothing in the transcript that was other than testimony concerning identification (a

c. _Peremptory challenge_. The defendant argues that the judge erred in ruling that the defendant had not established a prima facie case of discriminatory use of peremptory challenges sufficient to support his objection to the prosecutor's exercise of his fourth peremptory challenge to excuse a black woman.

The Fourteenth Amendment and art. 12 "prohibit a party from exercising peremptory challenges on the basis of race or gender." _Commonwealth_ v. _Lopes_, 478 Mass. 593, 597 (2018). See _Batson_ v. _Kentucky_, 476 U.S. 79, 95 (1986); _Commonwealth_ v. _Soares_, 377 Mass. 461, 486, cert. denied, 444 U.S. 881 (1979). A _Batson_-_Soares_ objection to a proposed peremptory challenge, such as that raised by trial counsel, triggers a three-step process. _Commonwealth_ v. _Robertson_, 480 Mass. 383, 390-391 (2018). First, the burden is on the objecting party to establish a "prima facie showing of impropriety" sufficient to "overcome[] the presumption of regularity afforded to peremptory challenges" (citation omitted). _Id_. If the judge finds that the objecting party established a prima facie case of discrimination, the party attempting to exercise the peremptory challenge bears the burden of proving a "group-neutral" reason for striking the juror. _Id_. at 391. Finally, the judge

_____

description of the events surrounding the shooting) would have made a difference in the jury's thinking.

evaluates whether the proffered reason is both adequate and genuine.  Id.

We have emphasized that the burden of making the requisite prima facie showing is not "a terribly weighty one." See Commonwealth v. Jones, 477 Mass. 307, 321 (2017), quoting Commonwealth v. Maldonado, 439 Mass. 460, 463 n.4 (2003).  The presumption of regularity can be rebutted by "a prima facie showing of either a pattern of challenges of members of the same discrete group, or, in certain circumstances, challenge of a single prospective juror within a protected class, where there is a likelihood that [the juror is] being excluded from the jury solely on the basis of . . . group membership" (quotation and citations omitted).  Commonwealth v. Issa, 466 Mass. 1, 8 (2013).  In determining whether a pattern of discrimination exists, a judge may consider all of the relevant circumstances, including (1) "the number and percentage of group members who have been excluded"; (2) "the possibility of an objective group-neutral explanation for the strike or strikes"; (3) "any similarities between excluded jurors and those, not members of the allegedly targeted group, who have been struck"; (4) "differences among the various members of the allegedly targeted group who were struck"; (5) "whether those excluded are members of the same protected

group as the defendant or the victim"; and (6) "the composition of the jurors already seated."  Jones, supra at 322.

The defendant raised a Batson-Soares objection to the Commonwealth's challenge to juror no. 179, "the third or fourth black person" excused by the prosecutor.  The trial judge rejected the defendant's contention that the prosecutor had engaged in a pattern of excluding black jurors.  The judge observed that the seated jurors included "four black people out of eight . . . .  So, obviously the Commonwealth passed on them."  The judge observed that the prosecutor had not exercised peremptory challenges on four black jurors who had been excused by request of the defendant or the codefendant.  He commented, "So that looks like . . . eight black African Americans that [the prosecutor has] passed on."  Out of fourteen challenges, the prosecutor sought to remove three prospective black jurors. The judge concluded, "I see no pattern at all.  So I'm not going to inquire as to [the prosecutor's] reason for excluding [juror no. 179]."

It does not appear that the prosecutor exercised a disproportionate number of peremptory challenges against prospective black jurors.  Juror no. 179 was the thirty-seventh potential juror the judge found to be indifferent.  Of the thirty-seven indifferent jurors, twelve were black, and the prosecutor was content with nine (seventy-five percent) of

those.  In other words, the prosecutor used peremptory
challenges to exclude three of the twelve indifferent black
jurors (one quarter of the indifferent jurors).  At the point
when the defendant raised his Batson-Soares objection, four of
the eight seated jurors were black.  See Commonwealth v. Oberle,
476 Mass. 539, 546 (2017).  Because one-half of the then-seated
jurors were black, and three-quarters of the indifferent black
jurors had not been excluded, there was no abuse of discretion
in the judge's determination that the defendant had not
established a pattern of racial discrimination.

Relying on Jones, 477 Mass. at 324-325, the defendant
argues that the trial judge erred in finding that the "presence
of some black people on the jury" was dispositive.  This case is
readily distinguishable from Jones.  In that case, the trial
judge "relied primarily, if not exclusively, on the presence of
the single African-American who at that point had been
seated."  Id. at 325.  Compare Commonwealth v. Ortega, 480 Mass.
603, 607 (2018) ("judge relied exclusively on the presence of a
single female African-American who at that point had been seated
in concluding that the defendant had not met his prima facie
burden").  Here, by contrast, the trial judge did not rely
"exclusively" or "primarily" on the number of black jurors
seated in the jury box.  He considered the number of potential
jurors determined to be indifferent and assessed whether the

prosecutor had challenged a disproportionate number of black jurors.  We discern no abuse of discretion in the judge's finding that the defendant did not establish a prima facie case of excluding black jurors.

d.  <u>Review under G. L. c. 278, § 33E</u>.  The defendant asks us to use our authority under G. L. c. 278, § 33E, to grant him a new trial or to reduce the verdict of murder in the first degree.  We have conducted a thorough review of the entire record and discern no basis upon which to exercise our authority under G. L. c. 278, § 33E.

3.  <u>Conclusion</u>.  We affirm the defendant's convictions and the denial of his motion for a new trial.

<u>So ordered</u>.